ANDREW R. HADEN
Acting United States Attorney
MARIO J. PEIA
ALEXANDRA F. FOSTER
California Bar No. 307503
Washington, D.C. Bar No. 470096
Assistant U.S. Attorney
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel.: (619) 546-9706/6735
Email: Mario.Peia/Alexandra.Foster@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21CR1683-WQH |
| Plaintiff, | DATE: March 10, 2025<br>TIME: 9:00 a.m. |
| v. | **UNITED STATES' TRIAL BRIEF** |
| BRIAN ALEXIS PATRON LOPEZ, | |
| Defendant. | |

## STATEMENT OF THE CASE

**A.    The Charges**

On September 29, 2022, a grand jury sitting in the Southern District of California filed a Second Superseding Indictment, which charged Defendant with: 1) Intentional Killing While Engaged in Drug Trafficking, in violation of 21 U.S.C. §848(e)(1)(A); 2) Hostage Taking Resulting in Death, in violation of 18 U.S.C. § 1203; and, 3) Conspiracy to Take Hostages Resulting in Death, in violation of 18 U.S.C. § 1203.

**B.    Trial Status**

A jury trial is scheduled for March 10, 2025. With the stipulations the parties have discussed, the government estimates its case-in-chief to last a week and a half to two weeks.

**C.    Defense Counsel**

Defendant is represented by appointed counsel, Meghan Blanco.

//

### D. Custody Status

Defendant is in federal custody.

### E. Interpreter

The government will be using an interpreter for certain witnesses.

### F. Jury Waiver

Defendant has not agreed to waive his right to a jury trial.

### G. Pretrial Motions

On August 13, 2024, the parties jointly filed a Motion to Declare the Case Complex, which the Court granted. ECF Nos. 206, 208. On October 28, 2024, Defendant filed Motions to Dismiss the Indictment and Suppress Defendant's Statements. ECF Nos. 215, 216. The Government responded on November 8, 2024. ECF Nos. 218 & 219. The Court denied the motions by written order. ECF No. 227. Defendant filed a Motion for Recusal on January 27, 2025. ECF No. 250. The Government responded on February 3, 2025. ECF No. 260 (Under Seal). On February 27, 2025, the Court issued an Order denying the Defendant's Motion for Recusal. ECF No. 292.

### H. Motions *In Limine*

On December 9, 2024, the Government filed motions *in limine* to (ECF No. 233):

1. Authenticate and Admit Records Pursuant to Fed. R. Evid. 902(11) & 902(13);
2. Admit Summary Charts and Illustrative Aids;
3. Admit the Victim's and Victim's Co-Conspirator's Statements;
4. Admit Jail Calls;
5. Preclude Evidence Pursuant to Fed. R. Evid. 609;
6. Admit Government Expert Testimony;
7. Admit Co-Conspirator and Defendant's Statements;
8. Admit Autopsy Evidence Without Proof of Each Link in the Chain of Custody;
9. Limit Reference to Punishment and Mandatory Minimums;

2

      10. Exclude Witnesses Other than Case Agents;

      11. Allow Attorney Voir Dire; and

      12. Compel Reciprocal Discovery.

On January 27, 2025, the Government filed supplemental motions *in limine* to (ECF No. 249):

1. Admit Government Expert Testimony;
2. Admit Summary Exhibits and Illustrative Aids;
3. Authenticate and Admit Records Pursuant to Fed. R. Evid. 902(11) & 902(13);
4. Admit the Victim's and Victim's Co-Conspirator Statements;
5. Admit Co-Conspirator and Defendant's Statements;
6. Admit Crime Scene Photographs; and
7. Preclude Defense Expert Testimony.

On the same day, Defendant filed motions *in limine* to (ECF Nos. 251, 252):

1. Preclude Admission of Statements that Do Not Meet the Requirements of FRE 801(d)(2)(E); and
2. Admit Statements by AUSA.

On February 25, 2025, Defendant filed a motion *in limine* to Preclude Evidence Produced after January 13, 2025. ECF No. 282. The Government filed its response in opposition on February 26, 2025. ECF No. 286.

**I.    Stipulations**

The parties met and conferred about stipulations on January 2, 2025. The parties have stipulated that the DNA and fingerprints of the individual autopsied at Dover Air Force Base on March 14, 2022 belong to M.A.R. The parties are in discussions as to (1) the

3

authenticity of the Facebook records, toll records, and a jail call, and (2) the accuracy of specific translations, and anticipate stipulations in those areas, as well.

**J.  Discovery**

The Government continues to comply with its discovery obligations. Per this Court's order, the Government produced the bulk of its remaining discovery on January 13, 2025. To date, Defendant has provided alibi and expert notice, but has not provided any reciprocal or expert discovery.

## STATEMENT OF FACTS

*i.  M.A.R. was arrested for body-carrying fentanyl into the United States.*

On May 27, 2020, victim M.A.R. was arrested at the San Ysidro Port-of-Entry as he crossed 0.36 pounds of fentanyl strapped to his body into the United States. He received a Notice to Appear. *See* 20-cr-1795-JAH.

*ii.  M.A.R. stole about 2.5 pounds of methamphetamine.*

On May 28, 2020, beginning at approximately 11:49 am, M.A.R. used his Facebook account to send a screenshot to a Facebook account used by M.A.A.G. The screenshot was a conversation between M.A.R. and Alan Lomeli-Luna, one of Defendant's co-conspirators, in which M.A.R. agreed to import methamphetamine for Lomeli. M.A.R. and M.A.A.G. agreed to steal the methamphetamine. M.A.R. said, "I'll go to the restroom…or I'll take off in a taxi."[1] M.A.A.G. responded, "In the restroom." In an apparent reference to the Notice to Appear, M.A.A.G. told M.A.R. to "give them the shet [sic] that you gave me."

Meanwhile, Lomeli used a different Facebook account to work with co-conspirator Wyatt Valencia to obtain the methamphetamine from an unindicted co-conspirator ("UCC-1").

Beginning at 5:09 pm on May 28, 2020, M.A.R. messaged M.A.A.G. that he was in Tijuana, and coordinating with Lomeli to pick up the methamphetamine. Just after

---

[1] The majority of communications in this case are in Spanish. All of the texts and Facebook communications in this section have been translated from Spanish into English.

approximately 5:17 pm, M.A.R. met with Lomeli to pick up the methamphetamine. Shortly thereafter, M.A.R. stole the methamphetamine by walking into a bathroom in Tijuana and then fleeing towards Mexican police officers to shake Lomeli.

UCC-1 initially held Lomeli and Valencia after UCC-1 learned of the theft. Eventually UCC-1 first released Valencia and then Lomeli on the promise that they would recoup the money or the drugs, or otherwise make the thief pay for the theft.

Later that night, at approximately 8:22 pm, M.A.R. sent Facebook messages to M.A.A.G. of several photographs of the methamphetamine that he stole. M.A.R. said it was "3…Lbs."[2]

   iii.   *Defendant's co-conspirators threatened M.A.R. and worked to find him.*

At 8:23 pm on May 28, 2020, one minute after M.A.R. messaged M.A.A.G., Valencia used a Facebook account to threaten M.A.R. He wrote, "You'd better return that stuff man, in good terms." M.A.R. responded, "I'm on the other side dude I wnated [sic] to cross it and it went to fucking hell…Tomorrow I'll Send you for [sic] of the paper that they told me [sic]." Valencia said, "You stole them and you're going to pay for them…or return the stuff, quit the fucking bullshit pa." M.A.R. reiterated, "If you want I'll pay for it dude there's no problem…Buut [sic] I'll Send you the picture tomorrow…For real the job went to fucking hell." The two continued to discuss M.A.R.'s claim that he had crossed, was arrested, and received a paper.'

At 8:29 pm, Defendant, using a Facebook account that he deleted prior to the execution of a warrant on June 21, 2022, sent a voice message to Valencia on a second Facebook account (not the account from which Valencia threatened M.A.R.). Defendant asked if Valencia was with UCC-1 and asked if Valencia could return the vacuum sealer

---

[2] DAI Andrew Flood will testify, in part, that the photographs viewed by themselves are consistent with what appears to be at least one pound—and closer to two and a half pounds—of methamphetamine. Further, DAI Flood will testify that the ransom demands for $2,000 to $3,000 is roughly proportionate to the approximate wholesale value of the methamphetamine if it were sold within San Diego County in May 2020.

machine that Defendant had left with UCC-1.³ At 8:57 pm, Valencia called Defendant through Facebook, but the call was not answered.

At 9:24 pm, co-conspirator Jonathan Montellano began to threaten M.A.R. through Facebook. He said, "You want to be a bad motherfucker…I'm a badder motherfucker bud…I know very well who you are fucker…And the pieces are not mine but because of the simple fact [you're] stealing I'm going to whack/kill you…return the pieces…Don't get in trouble." M.A.R. responded that he was going to pay the "2k." Meanwhile, Montellano contacted A.R. (juvenile) in an effort to find M.A.R.'s physical location.

Approximately three hours later, on May 29, 2020, at 12:42 am, Valencia sent a Facebook message to Defendant, "I'm talking to this fucker [M.A.R.] now..." Defendant asked, "And what does he have to say?" Valencia answered, "Just bullshit…That supposedly he panicked…and that's why he ran, but that later he thought about it and crossed, but Secondary busted him, and he was arrested…But, due to the virus they're not taking anybody…And supposedly, tomorrow he will send a photo of the document." Defendant responded, "Tell him we need to see him…in person…for the document…There's no need to have any problems." Valencia said, "Yeah…Tomorrow he said to have it don…done." Defendant answered, "That yea…That where would you meet him…In what mall."

Beginning at 9:37 am, Lomeli sent screenshots over Facebook to Valencia. The screenshots include a photograph of the Notice to Appear M.A.R. received on May 27, 2020. The date appears edited to change "27" to "28." In the screenshots, M.A.R. spoke to Lomeli about paying him the "2000…to avoid any fucking trouble."

At 11:02 am, A.R. sent Montellano a Facebook message that M.A.R. would be at the "Motel Parador…around 8 or 7."

//
//

---

³ DAI Flood will testify that methamphetamine is commonly packaged in a vacuum-sealed, airtight bag, which requires a vacuum sealer.

6

     *iv.    M.A.R. arrived at the Hotel Parador and coordinated payment with M.A.A.G.*

M.A.R. messaged M.A.A.G. that he was at the Hotel Parador in Tijuana, Mexico around 6:44 pm on May 29, 2020. The two coordinated M.A.R.'s payment for the stolen methamphetamine. In discussing payment, M.A.A.G. wrote, "Right now when they're on their way I'll let you know…to drop that off for you…Give me 1 hour at the latest." M.A.R. responded, "I'll be here…Number 4." The two continued to discuss the weight of the methamphetamine and the money. At 9:06 pm, M.A.A.G. answered, "It's above 2 and a half." He continued that it would be "550 each." The two coordinated to subtract the amount M.A.R. already received and concluded that M.A.R. would get "500" more. At 9:14 pm, M.A.A.G. messaged, "Okay my bud is telling me they're on their way," and at 9:44 pm, M.A.A.G. told M.A.R. to "come out now."

     *v.    Defendant and his co-conspirators kidnapped, tortured, and killed M.A.R., all while demanding a ransom from M.A.R.'s mother and stepfather.*

On the night of May 29, 2020, Defendant and his co-conspirators learned from a girl who had spoken with K.R. (juvenile) that M.A.R. would be at the Hotel Parador in Tijuana. At the time, Defendant and his co-conspirators were attending Defendant's grandmother's birthday party. At 11:54 pm, surveillance footage from the Hotel Parador shows a BMW X5 arriving at the hotel driveway and circling the parking lot/driveway. The BMW had distinctive features, which matched one owned by K.R.

At 11:57 pm, the same surveillance footage captured Defendant and K.R. dragging M.A.R. from the garage underneath his hotel room.[4] Defendant and K.R. beat M.A.R., while Defendant whipped M.A.R. with what appears to be a handgun, but was later determined to be a fake handgun. As K.R. and Defendant beat M.A.R., co-conspirator Luis

---

[4] After the kidnapping, M.A.R.'s mother traveled to the Hotel Parador to pick up items found by the Parador staff. Amongst those items was a bracelet, which did not belong to M.A.R. It is, however, identical to a bracelet that Defendant wore in a February 2020 photograph he posted on his Facebook account.

Dorantes walked from the BMW and punched M.A.R. in the midsection. Dorantes then dragged M.A.R. to the BMW by the seat of his pants.

The group drove M.A.R. to a park or empty lot near Defendant's grandmother's house. There, they continued to assault M.A.R., before taking M.A.R. to a nearby house. Defendant cut the victim's hands with a knife. At approximately 12:30 pm, Defendant and others began contacting M.A.R.'s mother (and later, his stepfather) using phone numbers connected to Lomeli. The hostage takers made demands of $2,000 and $3,000 or two or three pounds of methamphetamine.

At 1:30 am on May 30, 2020, Defendant contacted Valencia over Facebook, and the two had a 13 second call. Later in the morning on May 30, 2020, Lomeli's father lent a red car to the co-conspirators, and they used it to drive M.A.R. from the house to the Motel Luxor in Tijuana. Defendant, Lomeli, K.R., and G.A.V.P. brought M.A.R. to the Motel Luxor. Facebook conversations between Valencia and Lomeli, which begin at 7:23 am and continue through 8:13 am, reflect that M.A.R. was being held hostage at the Motel Luxor and that the kidnappers were waiting on the "tools[.]" Lomeli asked Valencia for "ideas where we can sign [M.A.R.] off." At 7:27 am, Valencia used Facebook to ask Defendant to order an Uber for G.A.V.P. Defendant responded, "I don't have any, man…I had already told…him." At 7:44 am, Valencia sent Lomeli a screenshot indicating that an Uber was going to the Motel Luxor and the subsequent conversation indicates G.A.V.P. left in the Uber. At 7:58 am, Valencia answered Lomeli and told Lomeli to "Smoke the guy [M.A.R.] by the dam dude…Or by cerro colorado…or the canal…It's right around the corner."

Meanwhile, Facebook records indicate Defendant called Dorantes three times (7:51 am, 7:56 am, and 8:13 am) on the morning of May 30, 2020, but the calls went unanswered. At some point in the morning, the group left the Motel Luxor and took M.A.R. to a residence in the Colonia Lago neighborhood.

Between 10:42 am and 12:24 pm that same day, M.A.R.'s stepfather continued to communicate with the co-conspirators. The stepfather asked for "a few hours" to get the ransom money together, but beginning at 3:32 pm, contact with M.A.R.'s stepfather began

to go unanswered.[5] During this time, M.A.R. was permitted to send an audio message, in which he said, "Hey uncle it's me. For real, just pay the money and then, they'll let me go. That's all you have to do, please. Ask Gil and my mom. Please." In another audio message, a hostage taker said simply, "I'm being fucking nice to you or not?" Meanwhile, M.A.R.'s mother's efforts to contact the co-conspirators began to go unanswered at 4:40 pm on May 30, 2020, with the last communication occurring at 10:17 am on that same date.

At 4:07 pm, on May 30, 2020, Defendant placed a video call to Dorantes that was 215 seconds long. While at the Colonia Lago residence, UCC-1 provided a revolver to Defendant, and UCC-1 told Defendant, "to do what [he] had to do." They discussed where to kill M.A.R. In the afternoon to evening of May 30, 2020, Defendant, Lomeli, and another individual, UCC-2, took M.A.R. into a ravine behind UCC-1's residence. Defendant shot M.A.R. approximately five times in the side of the head/ear area. The murder was videotaped, presumably by UCC-2.[6] Meanwhile, Lomeli stood watch at the top of the ravine. They left M.A.R.'s remains in the ravine. Mexican authorities recovered M.A.R.'s remains in the same spot on June 5, 2020.

Defendant told Lomeli, Montellano, Dorantes and Valencia that he (Defendant) had shot M.A.R. multiple times in the head. Defendant took over M.A.R.'s kidnapping and ultimately shot M.A.R. to up his status in the drug trafficking organization.

## **WITNESSES**

The government expects to offer (but reserves the right to amend) the following witnesses in its case-in-chief:

1. FBI Special Agent Jenna Paisley

---

[5] Another individual, J.A. (juvenile) learned about the ransom demands to M.A.R.'s parents. Although J.A. was not part of the group that kidnapped M.A.R., he extorted the victim's parents in the day following M.A.R.'s death by pretending to be a hostage taker. Through Facebook, J.A. demanded $1,000, which M.A.R.'s stepfather paid to J.A. in the United States. J.A. was prosecuted and convicted for his actions in juvenile court by the San Diego County District Attorney's Office.

[6] Defendant later showed the video and bragged about it to others. Despite efforts, the United States has not been able to acquire this video.

2. FBI Special Agent Jesse Crim
3. E.M.
4. O.G.
5. HSI Special Agent Jon Hutchinson
6. A.L.L.
7. W.V.P.
8. L.D.
9. J.M.M.
10. M.A.A.G.
11. S.L.L.
12. Mexican Criminalist Victor Eduardo Sanabria Veloz
13. Mexican Criminalist Giovani Bernabe Benitez
14. Dr. John Walsh
15. DA Investigator Andy Flood
16. DEA Supervisory Special Agent Darien Dir

## EXHIBITS

The government expects to offer (but reserves the right to amend) the following evidence in its case-in-chief:

1. Translated Facebook records, as represented through summary charts provided in motions *in limine*;
2. Video clips from Facebook records;
3. The victim's Notice To Appear;
4. Surveillance footage;
5. Photographs of:
    a. the BMW X5;
    b. the victim;
    c. the crime scene locations (taken in 2024);
    d. the recovery of the victim's remains;

      e. witnesses;

      f. the autopsy;

6. Google maps;
7. Toll records, as represented through summary charts;
8. Translated jail call(s);
9. Translated screenshots and audio of WhatsApp communications;
10. M.A.R.'s Birth Certificate;
11. Call logs;
12. One small grey metallic object recovered during autopsy;
13. Video of the items, which the Parador returned to E.M.; and
14. One bracelet.

## APPLICABLE LAW

**A.    Elements of Intentional Killing While Engaged in Drug Trafficking**

The government must prove the following elements of 21 U.S.C. § 848(e)(1)(A), Intentional Killing While Engaged in Drug Trafficking, beyond a reasonable doubt:

1. That M.A.R. was intentionally killed;
2. That the defendant killed M.A.R. or that the defendant counseled, commanded, induced, procured, or caused the intentional killing of M.A.R.; and
3. That the defendant did so while engaged in offenses punishable under Title 21, United States Code, Section 841(b)(1)(A) (Conspiracy to Distribute a Controlled Substance) <u>OR</u> Title 21, United States Code, Section 960(b)(1) (Conspiracy to Import a Controlled Substance):
   a. To be punishable under Title 21, United States Code, Section 841(b)(1)(A), the government must prove, beyond a reasonable doubt, that:
      i. there was an agreement between two or more persons to distribute methamphetamine;

        ii. the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose; and,

        iii. the offense involved 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, and that type and quantity fell within the scope of the defendant's agreement or was reasonably foreseeable to the defendant.

    OR

  b. To be punishable under Title 21, United States Code, Section 960(b)(1), the government must prove, beyond a reasonable doubt, that:

        i. there was an agreement between two or more persons to import methamphetamine;

        ii. the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose; and,

        iii. the offense involved 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, and that the type and quantity fell within the scope of the defendant's agreement or was reasonably foreseeable to the defendant.

1 Modern Federal Jury Instructions-Criminal ¶ 2.98B; *United States v. Vasquez*, 899 F.3d 363, 378 (5th Cir. 2018); Ninth Cir. Model Crim. Jury Instr. 12.5 (June 2024); Ninth Cir. Model Crim. Jury Instr. 12.19 & 11.1 (June 2024).

**B.     Hostage Taking Resulting in Death**

The government must prove the following elements of 18 U.S.C. § 1203, Hostage Taking Resulting in Death, beyond a reasonable doubt:

1. The defendant intentionally seized or detained a person;
2. The defendant threatened to kill, injure, or continue to detain that person;
3. The offense occurred outside the United States;
4. The person seized was a United States citizen;

     5. The defendant did so with the purpose and intention of compelling a third person to act, or refrain from acting, in some way, as an explicit or implicit condition for the release of the seized or detained person; and,

     6. The death of any person resulted.

A person is "seized" or "detained" when the person is held or confined against his or her will by physical restraint, fear, or deception for an appreciable period of time.

Ninth Cir. Model Crim. Jury Instr. 17.7 (June 2019); *United States v. Mikhel*, 889 F.3d 1003, 1022 (9th Cir. 2018) ("In addition, § 1203(b) requires some international element, i.e., that the offense occurred abroad, that the defendant is found abroad, that a defendant or victim is a foreign national, or that the defendant sought to compel something from the federal government."); *Camacho v. English*, 872 F.3d 811, 814 (7th Cir. 2017) ("In contrast, § 1201(a)'s enhancement provision requires simply that 'the death of any person results;' the specific cause of death is immaterial. Therefore, but-for causation is incompatible with the statutory goal of § 1201(a).") (citations omitted).

### C. Conspiracy to Take Hostages Resulting in Death

The government must prove the following elements of 18 U.S.C. § 1203, Conspiracy to Take Hostages Resulting in Death, beyond a reasonable doubt:

     1. Beginning on or about May 28, 2020, and ending on or about June 6, 2020, there was an agreement between two or more person to commit the crime of hostage taking resulting in death as charged in the indictment;

     2. The hostage taking occurred outside the United States;

     3. The person seized was a United States citizen;

     4. The defendant became a member of the conspiracy knowing at least one of its objects and intending to help accomplish it; and,

     5. The death of any person resulted.

Ninth Cir. Model Crim. Jury Instr. 11.1 (June 2024); *United States v. Mikhel*, 889 F.3d 1003, 1022 (9th Cir. 2018) ("In addition, § 1203(b) requires some international element, i.e., that the offense occurred abroad, that the defendant is found abroad, that a defendant

or victim is a foreign national, or that the defendant sought to compel something from the federal government."); *Camacho v. English*, 872 F.3d 811, 814 (7th Cir. 2017) ("In contrast, § 1201(a)'s enhancement provision requires simply that 'the death of any person results[;]' the specific cause of death is immaterial. Therefore, but-for causation is incompatible with the statutory goal of § 1201(a).") (citations omitted).

## **JURY INSTRUCTIONS**

The government will file jury instructions separately.

## ***VOIR DIRE***

The government requests that the following *voir dire* questions be posed in addition to the Court's standard questions:[7]

1. Are you, a member of your family, or close friend a lawyer? If yes, please indicate whether your relationship with that individual left you with a negative, positive or neutral impression of judges, the judicial system, prosecutors, defense attorneys, or lawyers generally.

2. Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what the witness personally saw or heard or did. Circumstantial evidence is indirect evidence that is proof of one or more facts from which you can find another fact. Either direct or circumstantial evidence can be the basis of a criminal conviction if the prosecution meets their burden of proof. Will you be able to rely on circumstantial evidence and base your conviction upon it if the prosecution meets their burden of proof?

3. You will hear the testimony of co-defendants who are cooperating with the government pursuant to a plea agreement. Do you have any strong feelings, one way or the other, in connection with the use of witnesses who are

---

[7] At a hearing on February 10, 2024, the Court asked the parties to list the questions that they planned to ask in voir dire. If the Court declines to ask these proposed questions, the government may ask them in their voir dire of the panel.

14

cooperating in exchange for a possible reduction of their sentence, which may prevent you from rendering a fair and impartial verdict in this case?

4. You will hear testimony from witnesses who have been convicted of crimes. You will be instructed to examine their testimony with greater caution. Would you have any difficulty accepting the testimony by these individuals under any circumstances?

5. Because this is not TV or a book, since the witnesses are ordinary people testifying about what they remember, and not actors working from a script or authors, there may be inconsistencies between the testimony of some witnesses. Can you be fair and open to the testimony of the witnesses, remembering that they are real people trying their best to remember events that happened some time ago, even though they have perceived or remembered some things slightly differently from each other?

6. Have you, a family member, or close friend ever: (a) been investigated for the use of any drug? (b) been stopped and searched for any drug?

7. Do you conscientiously disagree with the laws that prohibit the possession, use or distribution of any controlled substance? Does anybody here feel that the use or possession of narcotic drugs, such as methamphetamine, should be legalized?

8. This case involves the death of an individual. We anticipate part of the evidence will be crime scene photos, which will depict a deceased individual. Would any of you be so uncomfortable viewing these images that you could not be a fair and impartial juror in this case?

9. Have you, a family member, or close friend ever received training and/or worked in the area of forensic evidence collection, testing, and/or identification in subject matters including, but not limited to, fingerprints and/or DNA? If so, please explain.

10. Some of the evidence you may hear involves statements that the defendant and others were involved in a cartel. Do you have any views about or experiences with cartels that would make it difficult for you to be fair and impartial in this case to either the defendant or the government?

11. Have you, a family member, or close friend ever had any contact with law enforcement officials that has caused you to form strong opinions, either positive or negative, regarding law enforcement?

12. The government is not required to prove the defendant's motive in this case. The government does not have to prove why someone committed a crime, if the government proves the elements of the crime as set forth by the judge. People commit crimes for many reasons. You may find after listening to the evidence that motive has been established, or you may never determine the defendant's motive. But if the evidence proves that the defendant acted with the intent required by law and committed the crime, can you give me your assurance that you will find the defendant guilty regardless of the motive for his crime?

13. In this case, you will hear evidence that the defendant used a gun that was never recovered. Would that fact alone prevent you from convicting the defendant if you are convinced beyond a reasonable doubt as to his guilt?

14. In this case, you will hear that the victim was engaged in criminal activity. The issue in this case is not whether you approve of the victim's lifestyle. The issue is whether the defendant committed the crime. Every person has a right to be free from crime. Would the fact that the victim was involved in criminal activity prevent you from convicting the defendant if you are convinced beyond a reasonable doubt as to his guilt?

15. Have you, a family member, or close friend ever been a victim of a crime? If yes, please indicate the kind of crime or crimes involved. Has this experience left you with a negative, positive or neutral impression of law enforcement,

      judges, the judicial system, prosecutors, defense attorneys, or the criminal justice system?

16. As jurors, you may not consider the punishment that defendant might receive in determining whether the United States has met its burden of proof in this case. Does anyone think they would not be able to follow that instruction from the Court?

DATED: March 3, 2025    Respectfully submitted,

ANDREW R. HADEN
Acting United States Attorney

*/s/Mario J. Peia*
MARIO J. PEIA
ALEXANDRA F. FOSTER
Assistant United States Attorneys