MEGHAN BLANCO (238171)
LAW OFFICES OF MEGHAN BLANCO
    28202 Cabot Road, Suite 300
    Laguna Niguel, California 92677
    Telephone:    (949) 296-9869
    Facsimile:    (949) 606-8988
    E-mail:       mblanco@meghanblanco.com

Attorney for BRIAN ALEXIS PATRON LOPEZ

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>         v.<br><br>BRIAN ALEXIS PATRON LOPEZ,<br><br>        Defendant. | No. CR 21-CR-1683-WQH<br><br>SUPPLEMENTAL FILING RE JUROR CONTACT |

     Brian Alexis Patron Lopez, by and through his counsel of record, hereby files his supplemental briefing regarding a juror contact during trial.

                                    Respectfully Submitted,

Dated: March 31, 2025

                             ___//s// *Meghan Blanco*_____
                             MEGHAN BLANCO
                             Attorney for
                             BRIAN ALEXIS PATRON LOPEZ

## MEMORANDUM OF POINTS AND AUTHORITY

### I.    FACTS

On March 20, 2025, the Court informed all parties that juror number one informed the bailiff – after the verdicts against Mr. Patron were recorded and after the other jurors had left the jury deliberation room – that she received a text message, during the trial, from someone named Vanessa, who used a Colorado number. The juror indicated that she felt compelled to disclose the contact to the Court because one of the testifying cooperators was arrested in Colorado, and the name Vanessa was one the juror recognized from trial. However, she told the bailiff, in unequivocal terms, that she did not share or discuss the extraneous communication with any other juror.[1]

Juror number one was untruthful in her communications to the Court.

On the afternoon of March 20, 2025, Mr. Patron's investigator – retired DHS OIG Special Agent Brian Dennison – attempted to speak with juror number one at her place of employment.  However, two individuals who identified themselves as FBI agents were already on site, and they advised the resident security guard that Investigator Dennison was not part of their envoy and should not be allowed in.

---

[1] Counsel does not have a transcript of the March 20, 2025, hearing and recalls the Court advising the parties that juror number one told the bailiff that she did not discuss the text with any other juror.  However, in its papers, the government appears to recount these facts differently.  Both parties are operating by memory and have different memories of what was said during the March 20, 2025, hearing.

2

Consequently, he was not allowed in. Juror number one did not return investigator Dennison's subsequent calls.

On, March 22, 2025, Investigator Dennison spoke to another juror, juror number three. Contrary to what juror number one told the Court on March 19, 2025, juror number three indicated that juror number one did, in fact, show the extraneous text message to all of the jurors, and that the group discussed the text message at length. Further, juror three stated that, when juror one showed the extraneous communique to the entire group, the group discussed whether the text was spam or a contact by someone connected to the trial. After the juror presented the jury with the extraneous communique, discourse ensued with regard to the origin and meaning of the message. Juror number three advised that the texter, "Vanessa," said she knew juror number one and asked her if she was going to attend an event. After discussing the text with the other jurors, juror number one responded to the text by stating she did not know the woman and was going to block her.

The jury's discourse necessarily included consideration that the extraneous communique could have been an intimidation attempt by someone connected to the trial.

II.    ARGUMENT

The Sixth Amendment "guarantees criminal defendants a verdict by impartial, indifferent jurors." *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc). To

3

protect this right, it has been held that private communications between jurors and third persons are absolutely forbidden and invalidate the verdict. *Tong Xiong v. Felker*, 681 F.3d 1067 (9th Cir. 2012). In *Remmer v. United States*, 347 U.S. 227 (1954), the Court established that any "private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury" is deemed "presumptively prejudicial". *Id*. at 229.

In applying the *Remmer* rule, courts have consistently stated that the appropriate inquiry is whether the unauthorized contact is *potentially prejudicial*, not whether the parties alleged to have tampered with the jury did so intentionally. *See, e.g., Caliendo v. Warden*, 365 F.3d. 691 (9th Cir. 2004) (the presumption of prejudice applies when the unauthorized conduct or contact is possibly prejudicial); *Henley*, 238 F.3d at 1117 (the presumption of prejudice applies upon a showing that the "intrusion interfered with the jury's deliberations by distracting one or more of the jurors"). In *United States v. Angulo*, 4 F.3d 843, 846 (9th Cir. 1993), the court recognized that in order to determine whether the jury might have been prejudiced, it may be necessary to inquire into the jurors' perceptions of the conduct and any effect the conduct may have had on their ability to remain impartial and unbiased.

In *Angulo*, a juror received an anonymous call, in which the caller stated, "I know where you live." *Id.* The juror informed her fellow jurors of the call and also told the judge about the incident. The judge excused the juror but refused to order a

4

mistrial. *Id.* The Ninth Circuit reversed and directed the district court to conduct an evidentiary hearing, holding that "[u]nder these facts, the remaining jury members may well have believed that defendants were responsible for the threat and, based on that assumption, may have decided the merits of the case on that basis." *Id.* at 847 (emphasis added). Because there was no evidence either that anyone associated with the defendants had placed the call or that the call, which might well have been a harmless prank, was intended to influence the juror, let alone the other jurors, the Ninth Circuit's decision was necessarily based on the jurors' perceptions of the conduct at issue and not on the intent of the caller.

Similarly, in *United States. v. Dutkel*, 192 F.3d 893 (9th Cir. 1999), the Ninth Circuit held that, in determining whether the defendant had made a prima facie showing of jury tampering, thereby triggering the presumption of prejudice, the relevant inquiry is whether the intrusion had an adverse effect on the deliberations. To give meaning to the term "adverse effect," a court should consider "whether the intervention interfered with the jury's deliberations by distracting one or more of the jurors, or by introducing some other extraneous factor into the deliberative process." *Id.* Because, in *Dutkel*, the juror's concerns resulting from improper contacts might well have "prevented[him] from thinking about the evidence or paying attention to the judge's instructions," *id.* at 898, the Ninth Circuit held that a prima facie case had been established, which triggered the presumption of prejudice.

The Supreme Court has unequivocally and repeatedly held that due process requires that a trial judge hold a hearing to "determine the effect" of occurrences tending to prejudice the jury. *Smith v. Phillips*, 455 U.S. 209, (1982). A court *may not*, at a hearing to determine prejudice, consider testimony regarding the affected juror's mental processes in reaching the verdict." *Elias v. United States*, 537 U.S. 812 (2002). Thus, for example, a juror cannot testify to whether an outside influence caused him to change his vote from innocent to guilty. However, a court can and should consider the "effect of extraneous information or improper contacts on a juror's state of mind," a juror's "general fear and anxiety following" such an incident, and any other thoughts a juror might have about the contacts or conduct at issue. *Id*. In this regard, a juror's testimony concerning his fear that individuals would retaliate against him if he voted to acquit (or convict) would be admissible, although his statement that he actually cast his vote one way or the other because of that fear would not. *See Dutkel*, 192 F.3d at 898 (considering evidence that, because of the improper contacts, the juror was "a disturbed and troubled man, deeply concerned about his own and his family's safety"). Further, evidence regarding any influence that such improper conduct or contacts had on the jurors' abilities to fairly and impartially receive the evidence, listen to the testimony presented, and the judge's instructions is also admissible. *Henley*, 238 F.3d at 1117 (stating that because juror's concerns may well have prevented him from "thinking about the evidence or paying attention to the judge's instructions," the

6

presumption of prejudice should apply) (internal quotation omitted). Finally, the court may consider the likely consequence of actions that might cause jurors to feel intimidated regardless of whether the jurors admit such an effect. Thus, objective and subjective factors may both be considered.

Here, the jurors were subjected to graphic testimony about a murderous, retaliatory-fueled enterprise. Against that backdrop, juror number one received an extraneous communique from a source that she thought was, possibly, connected to that enterprise. However, in contravention of the court's pretrial jury instruction, requiring jurors to report any extraneous contact to the court, the juror remained silent. Instead, jury number one ruminated about the message, that she thought may have been from someone affiliated with the case, for days. Throughout that period, juror number one thought about, was distracted by, and repeatedly discussed, the extraneous communication. It was on her mind during witness testimony, closing arguments, jury instructions, and deliberations.

But the juror's misconduct did not end there. When the jury commenced deliberations, she irrevocably tainted the entire panel by commandeering the jury's focus, from the facts and evidence, to a disquisition about the origin and meaning of the extraneous communique. Reflective of the fact that the extraneous communique remained on her mind, even after the jurors collectively discussed it during deliberations, is that she, after the verdict was recorded, discussed the matter with the

bailiff.  But for reasons unknown, the juror claimed, when discussing the matter with the bailiff, that she did not discuss the matter with the other jurors.

On its face, the extraneous communication received by juror number one is presumptively prejudicial. Because juror number one dramatically compounded the impact of the message by discussing it with all other jurors, and the jury's consideration of the communique became inextricably intertwined in its deliberative process, the presumption of prejudice cannot be rebutted.

III.    AND EVIDENTIARY HEARING IS REQUIRED

Although the record, as it stands now, is sufficient to order a new trial, at a minimum the Court must hold an evidentiary hearing where the parties are allowed to question the entire jury on the scope of the taint/misconduct.

//

//

//

//

//

//

//

//

8

IV.    CONCLUSION

For the foregoing reasons, Mr. Patron urges the court to order all jurors to return for an evidentiary hearing[2].

Respectfully Submitted,

Dated: March 31, 2025

_____//s// Meghan Blanco_____
MEGHAN BLANCO
Attorney for
BRIAN ALEXIS PATRON LOPEZ

_____

[2] Counsel has been unable to locate every juror's contact information.  We have left messages with two additional jurors.  Only juror number three has spoken with the defense team so far.

## DECLARATION OF COUNSEL

1. I am counsel for Mr. Patron.

2. Following the March 20, 2025, status hearing, I asked Investigator Dennison to try to interview Juror Number One. Despite his best efforts, he has been unable to interview Juror Number One.

3. I also asked Investigator Dennison to try to interview other jurors. On March 22, 2025, he interviewed Juror Number Three.

4. Juror Number Three told Investigator Dennison that he and the rest of the jurors had seen and discussed the text at issue. He knew the name of the purported sender ("Vanessa"), and that the text was from a number in Denver. He also knew the contents of the message and juror number one's response to the message.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed this 31 day of March, 2025, in San Clemente, CA.

/s/ *Meghan Blanco*