MEGHAN BLANCO (238171)
LAW OFFICES OF MEGHAN BLANCO
28202 Cabot Road, Suite 300
Laguna Niguel, California 92677
Telephone:   (949) 296-9869
Facsimile:   (949) 606-8988
E-mail:      mblanco@meghanblanco.com

Attorney for BRIAN ALEXIS PATRON LOPEZ

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-CR-1683-WQH |
|---|---|
| Plaintiff, | MOTION FOR NEW TRIAL BASED UPON JUROR MISCONDUCT |
| v. | |
| BRIAN ALEXIS PATRON LOPEZ, | |
| Defendant. | |

    Brian Alexis Patron Lopez, by and through his counsel of record, hereby files the attached motion for new trial based upon juror misconduct. The motion is based on the attached memorandum of points and authorities, the evidence in this case, including trial and post-trial evidentiary hearing transcripts, the United States Constitution, and any other evidence the court wishes to hear.

//
//
//
//

1

Mr. Patron respectfully requests and opportunity to respond to the government's responsive brief prior to the hearing on this issue.

                                                Respectfully Submitted,

Dated: July 14, 2025

                                        __*//s// Meghan Blanco*_____
                                        MEGHAN BLANCO
                                        Attorney for
                                        BRIAN ALEXIS PATRON LOPEZ

MEMORANDUM OF POINTS AND AUTHORITY

I.      FACTS

In May 2020, Rendon entered into an agreement with C001 and C004 to transport drugs across the border. However, on May 28, 2020, after C001 and C004 gave Rendon drugs to transport, they were betrayed—Rendon absconded with the drugs. The friends who solicited Rendon's participation in the bungled scheme bore financial responsibility to Warrior, an associate of the Sinaloa Cartel, for the misappropriated drugs. Faced with a Hobson's choice of repaying Warrior for the stolen contraband or being killed, C001 and C004 embarked upon a quixotic quest to locate Rendon and recover the drugs.

After vigorously searching for Rendon, an associate located him at a Tijuana motel on May 29, 2020. The group abducted him and sought a monetary payment, from Rendon's family, to use to reimburse Warrior for the stolen drugs. C001 and C004, however, were unable to procure enough money to make Warrior whole. Accordingly, C001 and C004 availed themselves of the only alternative that, pursuant to drug trafficking protocol, would keep them from being killed: they delivered Rendon to Warrior. Rendon was then beaten, tortured, and killed.

C001, C002, C003, and C004 were apprehended, charged, and pled guilty. In an effort to reduce their sentences, they told the Government that Patron Lopez was the de facto ringleader of the plot to abduct and kill Rendon. Based thereon, the government apprehended and charged Patron Lopez. Patron Lopez's trial commenced on March 10, 2025. At trial, the friends testified that Patron Lopez, despite the fact that he bore no financial responsibility to Warrior for the bungled drug run, abducted and killed Rendon.

The Government did not introduce a scintilla of evidence of motive for Patron Lopez to have committed the charged crimes. Despite Patron's lack of motive, and the friends' wildly inconsistent testimony, the jury returned guilty verdicts on all counts. The jury's verdicts were returned on the afternoon of March 19, 2025.  Immediately thereafter, Juror 1 informed the court's bailiff that she received a text message during the trial, from a Colorado phone number, from somebody purportedly named Vanessa. Juror 1 brought this matter to the bailiff's attention because she thought it possible that the communique was initiated by someone affiliated with the cooperator (C003) who previously presided over a drug trafficking ring in Colorado.

At an evidentiary hearing, on May 16, 2025, Juror 1 testified, under oath, that: she received texts that she believed might be trial-related (5/16/25 Hearing Transcript ("HT") at 5:10); she responded to the communique (*id.*); she blocked the sender (*id.* at 5:18-19; 6:17); she deleted the communique (*id.* at 5:19; 6:17); she believed that the communique may have been trial-related (*id.* at 7:24-8:6; 8:22-9:7; 9:12-14; 10:17-11:4); she undeleted the communique so that she could show it to the other jurors (*id.* at 8:11-12); she sought "the opinion of two other jurors" as to whether the communique was trial-related (*id.* at 8:4-6); she used the internet to search for information about the communique (*id.* at 8:29-9:7); she acknowledged that the communique caused her mind to go to "negative places" (*id.* at 8:22-23); she noted that the communique caused her to feel "wary" (*id.* at 10:13-16); that she wanted "to be protective of [her] own safety" and "didn't want to take a chance" (*ibid.*); that, after ruminating about it for days, including through the entirely of the deliberative process, she wanted to "put it to bed" because the text would "keep being on [her] mind" (*id.* at 10:24-11:7); she solicited the bailiff's opinion as to whether the text was "something to be concerned about" (*ibid.*); and she discussed it with jurors, outside the deliberation room, during breaks (*id.* 12:19-20; 15:7-8).

Regrettably, Juror 1 waited until *after* a verdict was rendered to alert the court about the communique so that she could regain "piece of mind [sic]."

The impact that the communique had on Juror 1 was observed by the other jurors. Juror 3 initially heard about the message after another juror told him, and that prompted "a larger discussion" about the message. *Id.* at 22:18-21. Contrary to Juror 1's representation that she received the text message after closing arguments, Juror 3 indicated that Juror 1 told him about the text message "within the first third of the case . . . within . . . three or four days of starting." *Id.* at 20:25-21:2. And Juror 3 recalled that the communique caused Juror 1 "alarm" (*id*. at 21:13) and questioned why Juror 1 responded to the message, "but she did," by asking "who are you," "I don't know who you are," and "don't ever contact me again." *Id*. at 23:23-24:4. Although Juror 3 did not personally believe that text message was anything to worry about, he acknowledged that "there were no attempts to underestimate what it could be, you know." *Id*. at 26:25-27:7. Juror 4 stated that she understood that the communique caused Juror 1 to feel "freaked out." *Id*. at 38:3-6. Juror 1 also told juror 2 about the communique, to get her opinion of the "strange text" *Id*. at 17:21. Juror 7 similarly recalled that Juror 1 asked if the text was "something to be concerned about. *Id.* 40:7-10. Although Juror 7 did not personally believe that the text was related to the case, he and others told Juror 1 to report the communique to the court "if you feel it is related." *Id*. at 44:1-5. Juror 1 thereafter reported the text to the court. Juror 1 acknowledged that if she had not done that, "it would keep being on my mind." *Id*. at 11:6-7.

II.   Argument

The Sixth Amendment "guarantees criminal defendants a verdict by impartial, indifferent jurors." *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc). To

protect this right, it has been held that private communications between jurors and third persons are absolutely forbidden and invalidate the verdict. *Tong Xiong v. Felker*, 681 F.3d 1067 (9th Cir. 2012). In *Remmer v. United States*, 347 U.S. 227 (1954), the Court established that any "private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury" is deemed "presumptively prejudicial." *Id*. at 229.

In applying the *Remmer* rule, courts have consistently stated that the appropriate inquiry is whether the unauthorized contact is potentially prejudicial, not whether the parties alleged to have tampered with the jury did so intentionally. *See, e.g., Caliendo v. Warden*, 365 F.3d. 691 (9th Cir. 2004) (the presumption of prejudice applies when the unauthorized conduct or contact is possibly prejudicial); *Henley*, 238 F.3d at 1117 (the presumption of prejudice applies upon a showing that the "intrusion interfered with the jury's deliberations by distracting one or more of the jurors").

In this case, the jurors were subjected to graphic testimony about a DTO's murderous, retaliatory-fueled enterprise. Against that backdrop, Juror 1 received an extraneous communique from a source that she believed was possibly connected to the DTO. But in direct contravention of the Court's unequivocally clear instruction, directing jurors to report any extraneous contact to the court, Juror 1 remained silent. Instead, she ruminated about the message for days. Throughout this period, she thought about, repeatedly discussed, researched, and was distracted by, the extraneous communication. And her distractedness manifested itself when she commandeered the jury's focus, away from a discussion of the law and evidence, to a disquisition about the origin and meaning of the extraneous communique.

That Juror 1 spent such an inordinate amount of time distracted by the communique reflects her belief that the communique was possibly trial-related. And that belief is objectively reasonable. During trial, the government adduced evidence

that: i) a person named Vanessa was connected to the DTO; ii) a cooperator (C003) ran a DTO from Colorado prior to his cooperation; iii) and C003, after his cooperation agreement, corrupted prison guards within a California prison. Accordingly, she heard testimony that C003, despite his plea agreement, was actively engaged in corrupting the criminal justice system. Thus, it would have been reasonable for Juror 1 to believe that past was prologue and C003 was attempting to corrupt the jury process by contacting her.

Even if the communique was not, in fact, trial-related, Juror 1's subjective belief that it possibly was, prejudiced Patron Lopez. A defendant is prejudiced, and entitled to a new trial, if a juror's general fear and anxiety, following a potential tampering incident, creates a "reasonable possibility that the extraneous contact affected the verdict." *United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001). To determine whether or not a reasonable possibility exists that the extraneous contact affected the verdict, courts do not consider whether the contact caused a juror to change her vote—instead, the consideration is whether the contact affected deliberations by causing a juror to be distracted. *United States v. Dutkel*, 192 F.3d 893, 897 (9th Cir. 1999). Here, Juror 1's behavior, after receiving the communique, reflects her distractedness. Additionally, Juror 1 clearly testified that the communique distracted her.

In *United States v. Angulo*, 4 F.3d 843, 846 (9th Cir. 1993), a juror received an anonymous call, in which the caller stated, "I know where you live." *Id*. The juror informed her fellow jurors of the call and also told the judge about the incident. The judge excused the juror but refused to order a mistrial. *Id*. The Ninth Circuit reversed, holding that "[u]nder these facts, the remaining jury members may well have believed that defendants were responsible for the threat and, based on that assumption, may have decided the merits of the case on that basis." Id. at 847 (emphasis added). Because there was no evidence either that anyone associated with the defendants had

placed the call or that the call, which might well have been a harmless prank, was intended to influence the juror, let alone the other jurors, the Ninth Circuit's decision was necessarily based on the jurors' perceptions of the conduct at issue and not on the intent of the caller.

Similarly, in *United States v. Dutkel*, 192 F.3d 893 (9th Cir. 1999), the Ninth Circuit held that, in determining whether the defendant had made a prima facie showing of jury tampering, thereby triggering the presumption of prejudice, the relevant inquiry is whether the intrusion had an adverse effect on the deliberations. To give meaning to the term "adverse effect," a court should consider "whether the intervention interfered with the jury's deliberations by distracting one or more of the jurors, or by introducing some other extraneous factor into the deliberative process." *Id*. Because, in *Dutkel*, the juror's concerns resulting from improper contacts might well have "prevented[him] from thinking about the evidence or paying attention to the judge's instructions," *id*. at 898, the Ninth Circuit held that a prima facie case had been established, which triggered the presumption of prejudice. *See also United States v. Elias*, 269 F.3d 1003 (9th Cir. 2001) ("in determining whether the presumption of prejudice should apply, we again looked not to the intent of the individual alleged to have tampered with the jury, but rather to the jurors' perceptions of the conduct at issue").

The Ninth Circuit has found jury tampering based on contacts far more innocuous than the only that occurred here. In *United States v. Simtob*, 485 F.3d 1058 (9th Cir. 2007), for example, jury tampering was found where the defendant had merely "eye-balled" a juror during the trial. The court held: "Despite the lack of evidence that Simtob had any direct contact with the jury, the presumption of prejudice applies here because even indirect coercive contacts that could affect the peace of mind of the jurors could give rise to the Remmer presumption. That at least one juror's peace

of mind was affected is obvious from the district court's assertion that the juror claimed he or she felt threatened by Simtob. The Government, therefore, bears the burden of rebutting the presumption of prejudice". *Simtob*, 485 F.3d at 1064.

Jury tampering requires neither that a juror know which party is responsible for the tampering nor that the threatening behavior explicitly reference the outcome of the case. In *Dutkel*, the Ninth Circuit held that a co-defendant's bribery and coercion of a juror as to the co-defendant's case alone was prima facie jury tampering with respect to Dutkel as well, even though during the coercion of the juror, the co-defendant's henchmen specifically stated, "We don't care about Dutkel." *Id*. at 897. The coercion in that case was explicitly divorced from the outcome of Dutkel's trial, and yet the Ninth Circuit found jury tampering had occurred because the "intervention interfered with the jury's deliberations by distracting one or more of the jurors, or by introducing some other extraneous factor into the deliberative process." *Id*. Dutkel was not an outlier case. In *United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993), the contact, which the Ninth Circuit declared to be prejudicial, was nothing more than an anonymous phone call to a juror in which the caller said, "I know where you live." 4 F.3d at 846. The caller never identified himself and never mentioned the matter pending before the jury on which the juror served. Even though there were no facts tying the call to the case, and the trial court dismissed the juror who received the phone call, the Ninth Circuit concluded that the contact gave rise to the Remmer presumption because, as is the case here, the other jurors may have learned of the contact.

Juror 1, on the verge of deliberating a DTO kidnapping, torture, and murder case, was contacted by someone she believed was possibly connected to a DTO with a

history of corrupting the criminal justice system.[1] However, instead of reporting the contact, Juror 1 suppressed it from the court. And her misconduct did not end there—she conducted independent research into the source of the communique; she tainted the jury by discussing the matter with them; and she engaged in discussions with other jurors outside of the deliberation room. Had she instead complied with the court's instruction, and promptly reported the contact, the court would have had a panoply of options to ensure that the integrity of the trial was protected: replace Juror 1 with an alternate; disabuse Juror 1 of the notion that the communique was trial-related and restore her "peace of mind" before deliberations; ensure that other jurors were not distracted from deliberations; and/or issue a limiting instruction. However, Juror 1's failure to report this matter during the trial deprived the court of these options.[2] There is nothing Mr. Patron Lopez, the United States, or the court can do at this point to cure the damage caused by Juror 1's failure to timely alert the court of the text as she was repeatedly instructed to do. *See* Ninth Cir. Model Jury Instr. 1.8 ("A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to

---

[1]  Further, she heard testimony that C003 had significant motive to tamper with the jury: the cooperators stood to receive significantly reduced sentences if their trial testimony was deemed credible, and a conviction could have been viewed as a dispositive adjudication of their credibility.

[2] A juror's testimony that an extrinsic contact was not harmful is not controlling. Jeffries v. Wood, 114 F.3d 1484, 1490–91 (9th Cir. 1997) (reversing despite testimony from impacted jurors that the extraneous contact was not harmful because "at least two jurors had nearly the entire trial to contemplate the impermissible communication"), overruled on other grounds by Gonzalez v. Arizona, 677 F.3d 383 (9th Cir. 2012).

any outside information, please notify the court immediately") and 6.20 ("If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court. . . The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.").

As a result of Juror 1's misconduct, Patron Lopez was deprived of his Sixth Amendment and due process right to have twelve undistracted jurors decide his fate.

III. CONCLUSION

For the foregoing reasons, the court should order a new trial for Mr. Patron Lopez

Respectfully Submitted,

Dated: July 14, 2025

                                     __//s// *Meghan Blanco*_____
                                     MEGHAN BLANCO
                                     Attorney for
                                     BRIAN ALEXIS PATRON LOPEZ