# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:21-CR-1683-WQH |
| Plaintiff, | |
| v. | **ORDER** |
| BRIAN ALEXIS PATRON LOPEZ (4), | |
| Defendant. | |

HAYES, Judge:

The matter before the Court is the Motion for New Trial Based upon Juror Misconduct ("Motion for New Trial"), filed by Defendant Brian Alexis Patron Lopez ("Patron"). (ECF No. 372.)

## I.    Background Facts

On March 18, 2025, after a seven-day jury trial in the above-captioned case, the lawyers for both sides gave their closing arguments and the jury retired to deliberate at 2:46 p.m. (ECF No. 322.)

On March 19, 2025, at 1:37 p.m., the jury returned a verdict finding Patron guilty of intentional killing while engaged in drug trafficking, hostage taking resulting in death, and conspiracy to commit hostage taking resulting in death. (ECF Nos. 324, 325.) The jury was polled without issue and discharged. (ECF No. 324.) After Patron and all counsel left the courtroom for the day on March 19, 2025, the bailiff entered the jury

1

room to retrieve the trial exhibits and encountered Juror Number 1.[1] Juror Number 1 reported to the bailiff that she received a text message from a phone number that she did not recognize with a Denver area code from a person identifying themselves as "Vanessa." Juror Number 1 told the bailiff that she recalled that a witness in the trial was arrested in Colorado and had an associate with a name similar to Vanessa. After consultation with the Court, the bailiff returned to the jury room, informed Juror Number 1 that he could offer no advice and did not question her about the text message.

The following day, March 20, 2025, the Court conducted a hearing informing the parties of Juror Number 1's communication to the bailiff and ordering briefing on this juror issue. (ECF No. 331.)

On March 31, 2025, and April 7, 2025, the parties filed briefing on the juror issue. (ECF Nos. 333, 334, 335, 336.) The Government's brief stated:

> The text message that Juror 1 received intersects with this case in two unrelated and negligible ways. First, the name "Vaness" was raised once, in passing. It appears in Government Exhibit 107, pg. 13. When defense counsel asked about "Vaness" on cross examination, A.L. answered that she was someone who imported controlled substances for him, presumably from Tijuana to San Diego. "Vaness" was not mentioned again at trial. Second, J.M. was arrested in a hotel in Pueblo, Colorado, a city over 100 miles from Denver with a different area code. Once again, the location of J.M.'s arrest was only mentioned in passing and played no role in either side's presentation of evidence or arguments in opening or closing. The "Vaness" from the text and A.L. had no connection to Denver, and nothing linked J.M. to "Vaness." …
>
> Altogether, all available evidence, particularly the juror's anonymity, indicates the contact was not "sufficiently improper." And, even if it were, there is no "credible risk" of the message affecting the outcome of the case. This appears to be an unfortunate spam message that hints at two loose and unrelated connections to inconsequential parts of the case. As such, the Court should find that Defendant has not and cannot

---

[1] As discussed with the parties prior to trial and without objection, the Court always referred to the jurors by number and not by name. The jurors' names were known to counsel for both sides and to Court personnel, but otherwise the jurors' names and other personally identifying information were not disclosed publicly or to any other party or witness. During jury selection, the Court informed the jurors that referring to jurors by number rather than by name is a standard procedure to protect the privacy of the jurors that this Court and others employ.

meet his burden at step one of the *Godoy* [*v. Spearman*, 861 F.3d 956 (9th Cir. 2017)] test.

(ECF No. 333 at 3, 4.) The Government stated that "an evidentiary hearing is not warranted," and stated that "[t]he Court should make a finding that the contact was innocuous, take no further action, and proceed to sentencing…." (ECF No. 335 at 2.)

Defendant's brief stated that the defense investigator spoke with Juror Number 3, who purportedly said that Juror Number 1 showed him and other jurors the text message at issue and they discussed it. (*See* ECF No. 334 at 10.) Defendant stated:

> On its face, the extraneous communication received by juror number one is presumptively prejudicial. Because juror number one dramatically compounded the impact of the message by discussing it with all other jurors, and the jury's consideration of the communique became inextricably intertwined in its deliberative process, the presumption of prejudice cannot be rebutted. …
>
> Although the record, as it stands now, is sufficient to order a new trial, at a minimum the Court must hold an evidentiary hearing where the parties are allowed to question the entire jury on the scope of the taint/misconduct.

*Id*. at 8. Defendant stated that "[t]his is not a run-of-the-mill ex parte contact case—it is a jury tampering case," and the Court should "conduct an evidentiary hearing to determine the extent of prejudice." (ECF No. 336 at 8.)

The Court held a status hearing on April 14, 2025. (ECF No. 338.)

On April 21, 2025, the Court issued an Order "find[ing] that an evidentiary hearing is warranted to develop the record prior to considering the two-step process outlined" in *Remmer v. United States*, 347 U.S. 227 (1954) and *Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017) (en banc). (ECF No. 339 at 10.) The Court stated that, "[i]n certain circumstances, the Ninth Circuit has held that it is appropriate for a trial court to conduct an evidentiary hearing prior to deciding whether the defendant has met his burden at step one to be entitled to a presumption of prejudice." *Id*. at 6. The Court discussed in some detail *United States v. Angulo*, 4 F.3d 843, 846–47 (9th Cir. 1993)

("[T]he Supreme Court has stressed that the remedy for allegations of jury bias is a hearing, in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not it was prejudicial…. [W]ithout a hearing, a district court does not have the essential facts to properly evaluate a defendant's motion for mistrial.") (citing *Remmer*, 347 U.S. at 229–30 (1954)); *United States v. Jackson*, 209 F.3d 1103, 1110 (9th Cir. 2000) (same); and *United States v. Rutherford*, 371 F.3d 634, 644–45 (9th Cir. 2004) ("[I]t would not be appropriate for us, on this incomplete record, to determine whether the presumption should apply and whether the jurors were adversely influenced by the agents' conduct at the trial. Rather, we leave that task to the district judge following the holding of a further evidentiary hearing…. [T]he district court should allow the parties to introduce evidence regarding the jurors' perceptions of the agents' conduct and any discussions among the jurors concerning the possibility of retaliation if they voted to acquit. After reviewing the evidence, if the court determines that the agents' conduct raised a risk of influencing the verdict, then the presumption of prejudice should be applied.").

The Court found that all 12 jurors who deliberated should testify at the evidentiary hearing. The Court stated the following regarding the scope of the hearing:

> "The appropriate inquiry [at the hearing] is whether the unauthorized conduct raises a risk of influencing the verdict, or had an adverse effect on the deliberations." *Rutherford*, 371 F.3d at 644 (quotations omitted). At the hearing, the Court seeks to "'determine[] the circumstances of what transpired, the impact on the jurors, and whether or not it was prejudicial.'" *Jackson*, 209 F.3d at 1110 (quoting *Angulo*, 4 F.3d at 847 (emphasis omitted)). "[O]bjective and subjective factors may both be considered." *Rutherford*, 371 F.3d at 645. The Court must "conduct … inquiry of the juror from which it could draw … inferences of the juror's impartiality" and examine whether the text message "impaired the juror's ability to act impartially." [*United States v.*] *Simtob*, 485 F.3d [1058,] 1065 (9th Cir. 2007)]. The Court also must "consider the possibility that the juror may have communicated his or her perception of a threat to other jurors," *id.*, and consider "what effect the [text message] … had on them." *Angulo*, 4 F.3d at 847.

4

During the hearing, "a court may not, under [Federal] Rule [of Evidence] 606(b), consider testimony regarding the affected juror's mental processes in reaching the verdict." *Rutherford*, 371 F.3d at 644 (quotation omitted). "[F]or example, a juror cannot testify to whether an outside influence caused him to change his vote from innocent to guilty. However, a court can and should consider the effect of extraneous information or improper contacts on a juror's state of mind, a juror's general fear and anxiety following such an incident, and any other thoughts a juror might have about the contacts or conduct at issue." *Id*. (quotation omitted). For example, "a juror's testimony concerning his fear that individuals would retaliate against him if he voted to acquit (or convict) would be admissible, although his statement that he actually cast his vote one way or the other because of that fear would not." *Id*. "[E]vidence regarding any influence that such improper conduct or contacts had on the jurors' abilities to fairly and impartially receive the evidence, listen to the testimony presented, and the judge's instructions is also admissible." *Id*.

*Id*. at 10–11. The Court stated that, due to the limitations on the scope of the inquiry of jurors imposed by Rule 606(b), the Court would conduct the questioning of the jurors. The Court issued a briefing schedule allowing each party to file a list of proposed questions and any objections to the opposing party's proposed questions.

On April 22, 2025, the Court issued an Order with a letter attached that "the Court propose[d] w[ould] be delivered by agents for the Government to each juror in conjunction with the service of subpoenas requiring appearance at the evidentiary hearing." (ECF No. 341 at 1.) The letter stated in relevant part:

To the 12 jurors who deliberated in the case of *United States v. Brian Alexis Patron Lopez*:

I have ordered a two-day evidentiary hearing concerning a matter that has been brought to my attention that occurred during the trial in which you sat as a juror. I have instructed the Government to serve each of you with this letter and a subpoena requiring your attendance at one of the two days set for the evidentiary hearing: May 16, 2025 at 9AM, and May 19, 2025 at 9AM. You may choose to appear on either day. When you arrive at the address listed above at the time of the hearing, please wait outside the door to Courtroom 14B until someone comes to greet you. At the hearing, I will ask you questions related to a text message that one of you

5

received and which may have been discussed with other jurors. I expect the questioning of each of you to last a few minutes and then I expect your involvement in this matter will conclude.

I have instructed the agents who are serving you with this letter not to answer any questions about the hearing.

*Id*. at 3. The Court gave the parties an opportunity to object to the letter; neither party objected.

On May 15, 2025, the Government filed under seal a report of the actions taken by the Government's Case Agent to serve the jurors with subpoenas for the evidentiary hearing. (ECF No. 351.) The Case Agent reported that he and the Assistant United States Attorney ("AUSA") assigned to the case spoke to Juror Number 1 on the phone, and Juror Number 1 "explained that the 'text message' noted in Judge Hayes' letter was referring to a text message that she had received," and "[s]he said that it was 'my issue' and that it was 'just a text message' and that the court didn't need to involve the other jurors." *Id*. at 2. Juror Number 1 "repeatedly asked if she could explain the text message, but [the] AUSA … advised that the judge needed to ask her about the issue, and directed her to the letter." *Id*. The Case Agent reported that Juror Number 3 said he "was confused as to why a hearing was being held for something as insignificant as a text message," and that "this seemed unusual." *Id*. at 3. The Case Agent responded that "he could not provide [Juror Number 3] any information beyond what was in the letter from Judge Hayes." *Id*. The Case Agent's report contains no other information about comments from the jurors about the text message, the Court's letter, or the hearing.

## II.    Evidentiary Hearing

Between May 16, 2025, and May 21, 2025, the Court conducted a three-day evidentiary hearing. Each of the 12 deliberating jurors appeared, was placed under oath, and questioned by the Court. The Court's questions were informed by the proposed questions submitted by the parties, as constrained by the dictates of Federal Rule of Evidence 606(b). After the Court asked an initial round of questions of a juror, the Court

then spoke with both counsel at sidebar to inquire whether either counsel requested additional inquiry be made. Neither party objected to this process, to any of the Court's questions, or to the Court's refusal to ask any question. Neither party requested that any other witnesses be examined or any other evidence be obtained or considered. The jurors' relevant testimony is set forth below.

**A. Juror Number 1**

Juror Number 1 testified that she did not have a copy of the text exchange at issue because "I think I blocked [the sender] and deleted it." (ECF No. 374 at 5.) She testified that "[t]here were less than 10 messages" in the entire text exchange. *Id*. She testified:

> Basically, it was just first a casual, like, Oh, hi. How are you?
>
> And so I initially thought, like, maybe this is just a number I didn't know but was someone that I had known previously. So I think I just replied saying, Sorry, you have the wrong number.
>
> And then they continued on to just say – I think they gave a full name, Vanessa Zhang, and that we had met at a charity gala, which is when I knew that it was a scam, because I was like, I don't go to charity galas.
>
> So then I kind of just said a more firm, like, Sorry, this is the wrong number. Please don't contact me.
>
> And then I blocked it and deleted the messages.

*Id*. at 6. Juror Number 1 testified that "I initially thought it might have been someone I knew, so I didn't want to be rude. But once I figured out it was, like, a scam, then I was kind of like, Hey, please, like, leave me alone." *Id*. at 7.

Juror Number 1 testified that she received the text message "sometime when I was home after the day … that the lawyers gave their closings."[2] *Id*.

In response to the question of whether she thought that the text message was connected to the case, Juror Number 1 testified:

---

[2] As discussed previously, the lawyers gave their closing arguments on the afternoon of March 18, 2025. The jury returned its verdict at 1:37 p.m. on March 19, 2025.

> In, like, the tiniest bit of my mind that just goes to very negative places because the number, when I – I had also Googled the phone number to see if it would link to someone's social media that I knew.
>
> My Google result that came up said Colorado, I think. And so looking back at my notes, once I saw the name and I saw, like, Oh, it's associated with the witness that was being held or incarcerated in Colorado, that's when I kind of started putting things together, like, Is this something concerning? So those two factors made me think maybe this is associated, but odds are it's not.

*Id.* at 8–9. Juror Number 1 testified that she "Googled the phone number" the night she received the text message. *Id.* at 9.

In response to the question of whether she discussed the text message with any of the jurors, Juror Number 1 testified:

> I did just get, like, a second opinion from two of them only because when we were deliberating back there, I was looking through my notes and I saw the name – Vanness [sp], I think, was the name that was associated with one of the witnesses. And so putting that together, I was, like, Oh, is this something to be concerned about? So I did ask the opinion of two other jurors just to see – just to get a second opinion outside of my own brain.

*Id.* at 7–8. She testified that she "recovered the messages back from the deleted file folder and then showed it to them." *Id.* at 8. In response to the question of whether she recalled what the two jurors said to her, she testified: "I think they also kind of were just like, This is a weird coincidence, but nothing to be concerned about." *Id.* Later she testified that her "[b]est recollection" of what the two other jurors told her "is just, It's not important. It's not something to be worried about." *Id.* at 11.

In response to the question of when she shared the text message with the two other jurors, Juror Number 1 testified: "The next day, yeah, after we had deliberated. And then I had kind of realized, like, these things were similar, I guess. I don't know if that's the best word." *Id.* at 9. The Court asked, "And when you told the two jurors, were you all together, or did you do that privately with just two?" *Id.* at 11. Juror Number 1 responded: "I think it was just – it was private during one of the breaks, I

8

guess, as private as that can be." *Id*. When asked if she remembered the identity of the two jurors she spoke with about the text message, Juror Number 1 gave the first names of Juror Number 3 and Juror Number 7. *Id*. at 14.

Juror Number 1 testified:

THE COURT: And then during that time, did you reach a conclusion whether it was or was not connected to the case?

THE JUROR: Yeah. I personally had concluded, like, this is not something that's important. It's most likely spam and nothing that's actually connected with what's being discussed here.

THE COURT: And so as a result of that text message, did you fear any retaliation against you from any individual if you voted to acquit the defendant?

THE JUROR: No, none at all.

THE COURT: Did you fear any retaliation against you or – from any individual if you voted to convict?

THE JUROR: No, not at all.

THE COURT: Did you feel any intimidation or fear or concern from the message?

THE JUROR: I mean, to be quite honest, no. But just to be someone that's protective of my own safety, I didn't want to take a chance. So, ultimately, no, but I was wary.

THE COURT: And so when you – you said you were wary. And so the way you dealt with being wary, was that showing it to your fellow jurors or to the bailiff or – like, what did you do to make sure – to address that concern?
….

THE JUROR: So I did show it to [the bailiff] just to see if – because he works in the system, like, get his opinion and see if this is actually something to be concerned about just for my own peace of mind. Because

I knew that if I didn't ask and then left here, it would just keep, like – I don't know if that makes sense.

THE COURT: Sure.

THE JUROR: Like, it would keep being in my mind, and I just wanted to put it to bed.

….

THE COURT: Did it – did the text message in any way impact your ability to be fair and impartial?

THE JUROR: No, not at all.

THE COURT: Did it negatively impact your ability to listen to and follow the instructions that the Court gave you?

THE JUROR: No, not at all.

*Id*. at 9–11.

### B. Juror Number 3

Juror Number 3 testified that, "probably within the first third of the case, so within, say, three days or four days of starting," Juror Number 1 mentioned the text message at issue. *Id*. at 20–21. Juror Number 3 testified:

THE COURT: And do you recall what it was that she said about it?

THE JUROR: She showed me the message and let us know that she had contacted you and informed [the Court] about the text message.

I think the name was Vanessa or something, the contents of which sounded like a scam message that I think we all get, and I quickly dismissed it.

I think the coincidence with maybe one of the co-defendant's girlfriend also being from that same area in Colorado and the name similarity, I think, caused some alarm.

But personally, I thought it was just pure coincidence.

10

THE COURT: And so when she told you about it, when you learned about it, had she indicated that she had already brought it to the attention of the Court?

THE JUROR: Yes.

THE COURT: And were you outside in the hallway when she told you about it?

THE JUROR: I don't remember the exact location.

THE COURT: Okay. And so –

THE JUROR: Well – so one clarification. She showed me the message at the end of – as we were walking out after verdict was reached, and I was curious. I was like, Well, let me see the message.

But the first mention of it was earlier on, and I didn't see the message.

THE COURT: All right. And you didn't see the message at that time?

THE JUROR: No.

THE COURT: But then you saw it as you were walking out?

THE JUROR: Yeah.

THE COURT: So the first time – do you recall the first time it was ever mentioned?

THE JUROR: The first time it was – I don't remember the exact day, but, like I said, I think it was earlier on in the case. It was definitely before closing arguments, definitely before we deliberated. Like I said, probably within the first third of the case, maybe half, if I'm being generous.

But that was – it was mentioned in front of multiple people. I heard about it because someone else mentioned, Oh, juror number 1 got a message, and then it brought up a larger discussion, but –

THE COURT: Okay. So was this before there had been any deliberations?

THE JUROR: Yes.

THE COURT: Just sort of informal conversation?

THE JUROR: Yes.

THE COURT: And do you know who else participated in that conversation? Was it just all – many of you or –

THE JUROR: There was a few where the event had been brought up, and then I think people had different feelings about it. But it wasn't a substantial conversation. We're talking about just casual, you know, morning conversation or maybe after lunch or something like that.

THE COURT: Couple minutes?

THE JUROR: It was a few minutes, yeah.

THE COURT: And was the thought – or what was your thought about where it came from?

THE JUROR: Yeah. I mean, I'll reiterate that I, on a daily basis, get just random text messages from people.

I think it's a common messaging scheme. So for me, it was purely coincidence, the name and location. And I didn't think it was – I mean, but I understand the reason for raising the – you know, the issue, but I didn't think it was anything that would warrant further action.

THE COURT: And so you saw it – you saw it when you left the courtroom that day when the case was over?

THE JUROR: That was the first time, because I was curious. I was, like, Let me see it, so I can see the text messages back and forth.

And she had responded with some sort of inquiry about, like, Who are you? I don't know who you are, which I'm unclear why she did that, but she did. And then she's, like, I don't know you. Don't ever contact me again. And she blocked it.

And that was – it was maybe six messages back and forth. But I'm sure she was able to provide the exact screenshot of the message to this team.

THE COURT: And did you perceive the text message to be connected to this case?

THE JUROR: Absolutely not. And I made that clear at the time.

THE COURT: And due to the text message, did you fear any retaliation against you from any individual if you voted to acquit the defendant?

THE JUROR: Absolutely not. That did not factor into the decision at all, did not come up in the deliberation. I just want to state that.

THE COURT: Sure. And just a few more to follow up.

THE JUROR: Yeah.

THE COURT: Did you fear any retaliation against you from any individual if you voted to convict the defendant?

THE JUROR: No.

THE COURT: Did you feel any intimidation or fear or concern as a result of the text message at all?

THE JUROR: No.

THE COURT: Did the text message negatively impact your ability to be fair and impartial?

THE JUROR: No.

THE COURT: And did the text message affect your ability to follow the Court's jury instructions?

THE JUROR: No.

*Id*. at 21–25. After discussion with counsel for both sides at sidebar, Juror Number 3 testified:

> THE COURT: You mentioned that you wouldn't describe it as fear, that you didn't see that anybody was fearful of the text messages. Is that a fair comment?
>
> THE JUROR: That is correct.
>
> THE COURT: For a period of time – was there a – I guess when you say you wouldn't describe it as that, what would you describe? Were people just sort of curious or –
>
> THE JUROR: I would say curiosity, entertaining, you know, a comment a juror made and then sort of making their own decision about the validity of it.
>
> I've been really clear about where I stand with this Court, and I think others were just similarly curious.
>
> THE COURT: Right. Like, curious, like, Oh, is that a coincidence, or things of that nature?
>
> THE JUROR: Exactly. I mean, we're here for eight hours a day. This is all we're doing. And then this comes up, and it's, like, something to talk about. That would probably be the extent.

*Id*. at 30.

## C. Juror Number 7

Juror Number 7 testified as follows:

> THE COURT: During your jury service as a juror in this courtroom, did juror number 1 ever mention to you a text message that she may have received?
>
> THE JUROR: Yes.
>
> THE COURT: And do you recall when that was in the process? Was it before the lawyers made their closing arguments or after? Do you remember?

14

THE JUROR: I think it was after.

THE COURT: And do you recall how – how did you learn about it? Were you in a small group or was it all of you together?

THE JUROR: It was in the juror room, and she – I was one of the groups – one of the group of people that directly received her telling us. I think everyone was in the room at that time.

THE COURT: Were you taking a break and there was just a small group of you talking?

THE JUROR: I think so.

THE COURT: All right. And do you recall what it – what she showed – did she show it to you or just describe it to you?

THE JUROR: She did show it to me.

THE COURT: And then you had a chance to read it?

THE JUROR: Yes.

THE COURT: And then what did you – did she ask you your opinion? Or what did she ask you, and what did you say, if you can recall?

THE JUROR: She asked if I thought it was something to be concerned about, and I said no.

THE COURT: And was there somebody else with you at the time, or did she just tell you that individually?

THE JUROR: It was me and a couple of other people standing around. I don't remember who the other people were, though.

THE COURT: And so she asked you should she be concerned, and you said no?

THE JUROR: Yes.

15

THE COURT: And did you perceive the text message to be connected to this case?

THE JUROR: No.

THE COURT: Due to the text message, did you fear retaliation against you from any individual if you voted to acquit the defendant?

THE JUROR: No.

THE COURT: Due to the text message, did you fear any retaliation against you from any individual if you voted to convict the defendant?

THE JUROR: No.

THE COURT: Did you feel any intimidation or fear or concern as a result of the message?

THE JUROR: No.

THE COURT: Did the text message impact your ability to be fair and impartial?

THE JUROR: No.

THE COURT: Did the text message affect your ability to follow the Court's jury instructions?

THE JUROR: No.

*Id*. at 39–41. After sidebar with counsel, Juror Number 7 testified:

THE COURT: Do you recall, did you have just a single discussion about this text with juror number 1?

You know, you told us that she showed it to you. And then, you know, I think you told us what you thought.

And you thought it was – well, why don't you tell us what you thought.

16

THE JUROR: Well, so there was that conversation. And then, because I believe that was after the closing arguments and we were getting ready to leave, all of us, and I think myself and a couple of other jurors said, I don't think this is related, but if you feel like it's related, you should probably say something to the clerk or somebody, and then I think that concluded our discussion about it.

THE COURT: And so you – do you recall when it was – the first time it was brought up to you by juror number 1, do you remember when that was?

THE JUROR: Yes. I believe it was after the closing arguments, before we left for the final day.

THE COURT: Okay. And then you saw – you saw the message, and then you shared your thoughts with juror number 1; is that right?

THE JUROR: Yes.

THE COURT: And your thoughts were it wasn't connected; is that correct?

THE JUROR: Yes.

THE COURT: And then, when is the next time that that topic came up, the text? Was it after the case, after you were discharged?

THE JUROR: Yes. A few of us were planning to grab a drink together at a nearby spot, and so we had to wait for her because she said that she was going to go talk to somebody. So that was right before – after we all let out.

THE COURT: And so did you have any conversation with anybody other than Juror 1 about that text message before you were discharged?

THE JUROR: Not separately. Because there were other people standing around, in the first instance.

We all kind of looked at each other, so kind of.

THE COURT: Right. And the next time that you heard anything about this, the text message, was that after the case was over and you had been discharged?

THE JUROR: Yes.

*Id.* at 43–45.

### D. Juror Numbers 2, 4, 6, and 12

Juror Numbers 2, 4, 6, and 12 each testified that they first learned about the text message after the verdict was rendered and the jurors were discharged. *See id.* at 17–18, 32, 37, 48, 50; ECF No. 357 at 4–5.

Specifically, Juror Number 12 testified that he first heard about the text message after the jury had been discharged and Juror Number 1 told him about the text message in the jury room as the jurors were collecting their personal possessions to leave. (ECF No. 374 at 48.) Juror Number 12 testified: "I recall she received a text, the subject matter of which essentially being, 'Do you remember me?' and containing a name that may have been relevant to someone in the case, but I've forgotten, essentially." *Id.* at 49. Juror Number 12 testified: "She initially asked me if – I think the phrasing was something like, Is this anything? Which I suspect means, Is this text somehow concerning? And we spoke briefly – maybe you should tell the bailiff – but ultimately, nothing of any substance was discussed, really." *Id.* at 51. Juror Number 12 testified that Juror Number 1 said she would remain behind to tell the bailiff about the text. *See id.* at 49. Juror Number 12 testified that some of the other jurors had planned to meet outside the courthouse to have a drink together and he "informed [the jurors] who were waiting outside the courthouse the juror [number 1] may be late to any arrangements." *Id.* at 49–50.

Juror Number 2 testified that she first heard about the text after the jury was discharged and "there w[ere] several of us outside the courthouse, and [Juror Number 1] said she had gotten some strange text from – but I don't recall the details. To me, it just sounded – I didn't think anything of it. It just sounded like a phishing text or spam

or something." *Id*. at 17; *see also id*. at 18 (Juror Number 2 testified that "I didn't think it had anything to do with the case because, you know, I get suspicious texts all the time, and I just disregard them.").

Juror Number 4 testified that she first heard about the text message after the jury was discharged and a group of four or five jurors that included Juror Numbers 3 and 7 "were outside of the building" and "[w]e were standing around saying good-bye, waiting for juror number 1. And a few of the other jurors were, like, Oh, she's up there because she got a weird text message." *Id*. at 32–33; 37. Juror Number 4 testified that "they were waiting for [Juror Number 1] to tell the judge or tell the clerk," and the other jurors "were like, Oh, she's freaked out about this text she got." *Id*. at 37 & 38. Juror Number 4 testified that the other jurors told her the text "was from a Colorado number, so [Juror Number 1]'s, like, weird about that or, like, wants to ask about it or tell the judge about it." *Id*. at 36.

Juror Number 6 testified that she first heard about the text message after the jury was discharged while walking with another juror out of the courthouse, and the other juror said Juror Number 1 received "a text message from Denver," and "[t]hat is all I know." (ECF No. 357 at 5.)

### E. Juror Numbers 5, 8, 9, 10, and 11

The remaining jurors testified that they did not learn anything about the text message received by Juror Number 1 either before or after the jury was discharged. *Id*. at 3 (Juror Number 5), 7 (Juror Number 8), 8 (Juror Number 11); ECF No. 374 at 46–47 (Juror Number 9); ECF No. 358 at 3–4 (Juror Number 10).

### III.    Findings of Fact

The Court finds that each juror was sincere in his or her efforts to testify truthfully and—with a few exceptions discussed below—the jurors were credible in their testimony.

The Court finds that Juror Number 1 credibly testified that she received the first text message at issue after she left the courthouse for the day on March 18, 2025—

which was the day the lawyers gave their closing arguments and the jury then retired to begin deliberations. (*See* ECF No. 374 at 7, 9.) Juror Number 1's testimony about the timing of the discussion of the text was corroborated by Juror Number 7's credible testimony that the discussion of the text occurred after closing arguments. Juror Number 3's contrary testimony that he learned of the text message during the first half or even first third of the trial (thus during the week of March 10, 2025) is not credible as compared to Juror Number 1's testimony. The text exchange clearly made a greater impression on Juror Number 1 as compared to Juror Number 3, who "quickly dismissed it" as "pure coincidence." *Id*. at 21. And as compared to the other jurors, Juror Number 3's demeanor while testifying appeared more dismissive and less thoughtful. Therefore, the Court assigns greater weight to Juror Number 1's recollection of the events as compared to Juror Number 3's recollection.[3]

Juror Number 1 credibly testified that she first received a text from an unknown number with "a casual, … Oh, hi. How are you?" *Id*. at 6. Juror Number 1 thought "maybe this is just a number I didn't know but was someone that I had known previously," and she "replied saying, Sorry, you have the wrong number." *Id*. The unknown sender then "gave a full name, Vanessa Zhang, and that we had met at a charity gala." *Id*. At this point, Juror Number 1 credibly stated that she then "knew that it was a scam, because I was like, I don't go to charity galas." *Id*. Juror Number 1 then texted, "Sorry, this is the wrong number. Please don't contact me." *Id*. Then Juror Number 1 "blocked [the phone number] and deleted the messages." *Id*. Juror Number 1 then "Googled the phone number to see if it would link to someone's social media that I knew," and learned that the area code was assigned to Colorado. *Id*. at 8.

The Court finds that Juror Number 1 first thought that the text was possibly connected to the case the next day, on March 19, 2025, which was the final day of

---

[3] For these reasons, the Court also finds not credible Juror Number 3's testimony that, "within the first third of the case," Juror Number 1 "let us know that she had contacted [the Court] and informed [the Court] about the text message." *Id*. at 20–21.

deliberations, as she was looking at her notes in the jury room.[4] Specifically, Juror Number 1 testified that "looking back at my notes, once I saw the name and I saw, like, Oh, it's associated with the witness that was being held or incarcerated in Colorado, that's when I kind of started putting things together, like, Is this something concerning? So those two factors made me think maybe this is associated, but odds are it's not." *Id.* at 9; *see also id.* at 7–8 ("[W]hen we were deliberating back there, I was looking through my notes and I saw the name – Vanness, I think, was the name that was associated with one of the witnesses. And so putting that together, I was, like, Oh, is this something to be concerned about?"). The Court instructed the jurors to leave their notes in the jury room when they left for the day, and there is no evidence that Juror Number 1 disobeyed that instruction and took her notes from the jury room. Therefore, it appears that Juror Number 1 first had the thought that "maybe this [text] is associated [with the case], but odds are it's not," upon reviewing her notes when she returned to the jury room on March 19, 2025.

The Court finds that, once Juror Number 1 "th[ought] maybe this is associated, but odds are it's not," she brought up the text exchange in "private" with Juror Numbers 3 and 7 on March 19, 2025, at a time when the jury was not actively deliberating, because the jury was on a break or all of the jurors had not yet arrived to the courthouse at the beginning of the day. *Id.* at 11, 14; *see also id.* at 39. Juror Number 1 testified that she wanted "a second opinion from two of them." *Id.* at 7. To the extent Juror Numbers 3 and 7 testified differently and/or were unsure about how many other people engaged in this pre-verdict conversation about the text exchange, *see id.* at 23 & 40, the Court finds Juror Number 1's more precise recollection to be more credible—a finding which is supported by the testimony of the remaining nine jurors who uniformly and credibly testified that they did not learn of the text exchange prior to the verdict being returned and the jury being discharged. At the urging of Juror Number 3, *see id.* at 23, Juror

---

[4] For the reasons already discussed, the Court finds Juror Number 3's contrary testimony about the timing of his discussion with Juror Number 1 about the text message to be not credible.

Number 1 recovered the deleted text exchange on her phone and showed it to Juror Numbers 3 and 7. *See id*. at 8, 23, 40. Both Juror Numbers 3 and 7 told Juror Number 1 that they did not view the text exchange as connected to the case or something to be concerned about—as Juror Number 1 stated, "they also kind of were just like, This is a weird coincidence, but nothing to be concerned about." *Id*. at 8; *see also id*. at 21, 40. At some point after this discussion, the jury reached its verdict, notified the Court that a verdict had been reached, returned the verdict, was polled without incident, and was discharged.

When the jurors returned to the jury room after being discharged, Juror Numbers 3, 7, and 12 discussed the text exchange with Juror Number 1. This was the first time Juror Number 12 had heard about the text exchange. *See id*. at 48. At least one of the jurors suggested "maybe [Juror Number 1] should tell the bailiff" about the text. *Id*. at 51; *see also id*. at 43–44. Juror Number 1 decided to tell the bailiff "to see if – because he works in the system, like, get his opinion and see if this is actually something to be concerned about just for my own peace of mind," and because "it would keep being in my mind, and I just wanted to put it to bed." *Id*. at 10.

A group of jurors had planned to have a drink together after being discharged and the jurors in this group waited outside the courthouse for Juror Number 1 while she spoke with the bailiff about the text exchange. *Id*. at 44, 49–50. The group of waiting jurors included Juror Numbers 2, 4, 6, 7, and 12. Juror Number 4 testified that, while waiting for Juror Number 1 outside the courthouse, one or more other jurors said Juror Number 1 was "freaked out about this text she got," and the text "was from a Colorado number, so [Juror Number 1]'s, like, weird about that." *Id*. at 36, 38.

The Court gives little weight to Juror Number 4's hearsay statement about Juror Number 1's "freaked out" and "weird" reaction to the text given that Juror Number 4 did not testify that she witnessed Juror Number 1's reaction herself and did not identify the speaker of the hearsay statements. Instead, the Court gives greater weight to the testimony of Juror Number 1 as to her own reaction to the text exchange, and also to

the testimony of the first-hand observations of Juror Number 1's reactions given by Juror Numbers 7 and 3.

Because the text was not received until after the jury had begun deliberating, the text exchange could not have interfered with any juror's ability to follow the evidence, the lawyers' closing arguments, and the Court's reading of the final jury instructions. And the nine deliberating jurors who had no knowledge of the text exchange until after being discharged could not have been affected by it. The Court finds that the text exchange was never discussed during active deliberations; instead, prior to the jury's discharge, the text exchange was only discussed once during a break in a private conversation between Juror Numbers 1, 3, and 7.

The Court finds that Juror Numbers 3 and 7 credibly and unequivocally testified that they did not perceive the text message as connected to the case. Juror Number 1 credibly testified that she "personally had concluded, like, this is not something that's important. It's most likely spam and nothing that's actually connected with what's being discussed here." *Id*. at 9–10. Juror Number 1 credibly testified that she felt "no" "intimidation or fear or concern from the message" "[b]ut just to be someone that's protective of [her] own safety, [she] didn't want to take a chance. So, ultimately, no, but [she] was wary." *Id*. at 10. She dealt with her "wariness" by first raising the issue with other jurors and then with the bailiff. The Court finds that all three jurors who knew of the text exchange prior to the verdict testified unhesitatingly, unconditionally, resolutely, and credibly that the text exchange did not cause them to fear any retaliation, did not impact their ability to follow the Court's instructions, and did not impact their ability to be fair and impartial.

During the discussion of the application of the facts to the legal standards below, the Court will supplement these factual findings as necessary.

## IV.    Contentions of the Parties

On July 14, 2025, Defendant filed the pending Motion for New Trial. (ECF No. 372.) Defendant contends:

Juror 1, on the verge of deliberating a DTO [Drug Trafficking Organization] kidnapping, torture, and murder case, was contacted by someone she believed was possibly connected to a DTO with a history of corrupting the criminal justice system. However, instead of reporting the contact, Juror 1 suppressed it from the court. And her misconduct did not end there—she conducted independent research into the source of the communique; she tainted the jury by discussing the matter with them; and she engaged in discussions with other jurors outside of the deliberation room. Had she instead complied with the court's instruction, and promptly reported the contact, the court would have had a panoply of options to ensure that the integrity of the trial was protected: replace Juror 1 with an alternate; disabuse Juror 1 of the notion that the communique was trial-related and restore her "peace of mind" before deliberations; ensure that other jurors were not distracted from deliberations; and/or issue a limiting instruction. However, Juror 1's failure to report this matter during the trial deprived the court of these options. There is nothing Mr. Patron Lopez, the United States, or the court can do at this point to cure the damage caused by Juror 1's failure to timely alert the court of the text as she was repeatedly instructed to do.

As a result of Juror 1's misconduct, Patron Lopez was deprived of his Sixth Amendment and due process right to have twelve undistracted jurors decide his fate.

*Id.* at 10–11.

On July 28, 2025, the Government filed an opposition to the Motion for New Trial. (ECF No. 375.) The Government contends:

Juror 1 received a spam message just after closing arguments. She immediately knew it was a spam message. The few jurors who knew about the message before being discharged all treated the message as spam and believed it had no connection to the case. All jurors testified that they did not feel intimidation, fear, or concern, that they could be fair and impartial, and that they could listen to and follow the Court's instructions. The messages had no influence on the jury, and Defendant's motion is factually and legally meritless. It should be denied.

*Id.* at 1.

On August 4, 2025, the Court heard oral argument on the Motion for New Trial. (ECF No. 378.)

### V.     Discussion

"A defendant has a Sixth Amendment right to 'a verdict by impartial, indifferent jurors' to avoid any bias or prejudice that might affect the defendant's right to a fair trial." *United States v. Simtob*, 485 F.3d 1058, 1064 (9th Cir. 2007) (quoting *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc)). "Improper influence or bias of a single juror would affect that right." *Id*.

In the Motion for New Trial, Defendant repeatedly references "jury tampering" and cites caselaw addressing allegations of jury tampering or, more broadly, a juror's contact with an outside party. (*See* ECF No. 372 at 6 ("In *Remmer v. United States*, 347 U.S. 227 (1954), the Court established that any 'private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury' is deemed 'presumptively prejudicial.'"), 7 ("A defendant is prejudiced, and entitled to a new trial, if a juror's general fear and anxiety, following a potential tampering incident, creates a 'reasonable possibility that the extraneous contact affected the verdict.'") (quoting *United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001)), 8 ("The Ninth Circuit has found jury tampering based on contacts far more innocuous than the only that occurred here.") (citing *United States v. Simtob*, 485 F.3d 1058 (9th Cir. 2007)), and 9 ("Jury tampering requires neither that a juror know which party is responsible for the tampering nor that the threatening behavior explicitly reference the outcome of the case.") (citing *United States v. Dutkel*, 192 F.3d 893 (9th Cir. 1999), and *United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993)).) The Ninth Circuit has "held that a test derived from two Supreme Court cases from 1892 and 1954 constitutes clearly established federal law for evaluating a juror's contact with an outside party." *Von Tobel v. Benedetti*, 975 F.3d 849, 853 (9th Cir. 2020) (citing *Godoy v. Spearman*, 861 F.3d 956, 964 (9th Cir. 2017) (en banc); *Remmer v. United States*, 347 U.S. 227 (1954); *Mattox v. United States*, 146 U.S. 140 (1892)). The Court finds this "*Godoy* test" to be the most appropriate to the pending Motion for New Trial and the Court applies the *Godoy* test to the facts below.

Defendant also bases the Motion for New Trial on Juror Number 1's "misconduct" in "suppress[ing] [the text] from the court," "conduct[ing] independent research into the source of the communique," and "taint[ing] the jury by discussing the matter with them." (ECF No. 372 at 10.) Although Defendant cites no caselaw to support this alternative basis for the pending motion, the Court finds that Defendant has adequately raised the issue. "Allegations of juror misconduct implicate grave interests." *United States v. Montes*, 628 F.3d 1183, 1187 (9th Cir. 2011). "A juror's communication of extraneous information implicates the Confrontation Clause." *Id.* (citing *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000)). "The juror in effect becomes an unsworn witness, not subject to confrontation or cross examination." *Id.* (quoting *Sassounian*, 230 F.3d at 1108). "If a court determines that a juror has improperly brought extraneous information to the jury's attention, the inquiry must then focus on whether 'there is a reasonable possibility that the extraneous information could have affected the verdict.'" *Id.* (quoting *United States v. Keating*, 147 F.3d 895, 900 (1998)); *see also United States v. Mills*, 280 F.3d 915, 921 (9th Cir. 2002) ("Mills was entitled to a new trial 'if there existed a reasonable possibility that the extrinsic material could have affected the verdict.'") (quoting *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir. 1979)). The Court will also evaluate whether a new trial is warranted due to Juror Number 1's alleged misconduct.

## A. *Godoy* Test for Evaluating Improper Contact between a Juror and an Outside Party

A court applies a two-step test "[w]hen a defendant alleges improper contact between a juror and an outside party[.]" *Godoy*, 861 F.3d at 962. "[T]he court asks at step one whether the contact was 'possibly prejudicial.'" *Id.* (quoting *Mattox*, 146 U.S. at 150). "If so, the contact is 'deemed presumptively prejudicial' and the court moves to step two, where the 'burden rests heavily upon the [government] to establish' the contact was actually 'harmless.'" *Id.* (quoting *Remmer*, 347 U.S. at 229). "If the

[government] does not prove harmlessness [at step two], the court sets aside the verdict." *Id*.

### 1. Step One

"As an initial matter, even before triggering the presumption [of prejudice], a determination must be made into the type of contact at issue." *Clark v. Chappell*, 936 F.3d 944, 970 (2019) (quotation omitted). The Ninth Circuit "recognize[s] the practical impossibility of shielding jurors from all contact with the outside world, and also that not all such contacts risk influencing the verdict." *Godoy*, 861 F.3d at 967. "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). "Thus, folded into defendant's burden at step one, before triggering the presumption, is a showing that the juror's contact with the non-juror was 'sufficiently improper.'" *Clark*, 936 F.3d at 970 (quoting *Godoy*, 861 F.3d at 967).

"Once the contact has been determined to be sufficiently improper, the court moves on to the second half of the first step: determining whether the sufficiently improper contact gives rise to a 'credible risk of affecting the outcome of the case.'" *Clark*, 936 F.3d at 970 (quoting *Godoy*, 861 F.3d at 967). "Because 'highly troubling contacts do not necessarily raise a presumption of prejudice,' courts 'consider[ ] the full context of the contact to determine whether a credible risk of prejudice exists.'" *Clark*, 936 F.3d at 970 (quoting *Godoy*, 861 F.3d at 967). "Among the considerations relevant to this determination are the identity of the outside party and the nature of the contact." *Godoy*, 861 F.3d at 967. "Similarly—regardless of the outside party's identity— communications about the matter pending before the jury, if not made in pursuance of the rules and the instructions of the court, greatly increase the risk of prejudice." *Id*. (quotation omitted). "At step one, the court considers the full context of the contact to determine whether a credible risk of prejudice exists…. [E]ven contact about the case may be insufficient to trigger the presumption if the surrounding circumstances show the contact was innocuous." *Id*. at 168. The Ninth Circuit has stated:

27

[T]o determine whether the defendant has met his or her burden to show possible prejudice, courts can consider a variety of factors, including: (1) whether the communication concerned the case; (2) the length and nature of the contact; (3) the identity and role at trial of the parties involved; (4) evidence of the actual impact on the juror; and (5) the possibility of eliminating prejudice through limiting instructions.

*Von Tobel*, 975 F.3d at 858 (citing *Caliendo v. Warden of California Men's Colony*, 365 F.3d 691, 697–98 (9th Cir. 2004); *Angulo*, 4 F.3d at 847). "After providing several variations of the defendant's burden [at step-one], in *Godoy* we settled on requiring a defendant to show that the contact was 'sufficiently improper as to raise a credible risk of affecting the outcome of the case,' or of 'influencing the verdict.'" *Id.* (quoting *Godoy*, 861 F.3d at 967, 970). "[T]he defendant's burden at step one cannot be met by threadbare or speculative allegations of misconduct." *Godoy*, 861 F.3d at 967 (quotation omitted). "[H]owever, the defendant's burden at step one to show a possibility of prejudice is not onerous." *Id.* at 968. The Ninth Circuit's "standard thus falls between requiring more than a theoretical possibility of prejudice and less than actual prejudice." *Von Tobel*, 975 F.3d at 858.

### a. Type of Contact at Issue

In applying step one of the *Godoy* test, the Court first determines "the type of contact at issue," and decides whether Defendant has made "a showing that the juror's contact with the non-juror was 'sufficiently improper.'" *Clark*, 936 F.3d at 970 (quoting *Godoy*, 861 F.3d at 967).

In analyzing this step—and throughout the entire *Godoy* test—the Court ignores the intent of the sender of the text. For example, in *Rutherford*, after the defendants were convicted of tax evasion, the defendants submitted post-trial affidavits from three jurors and an associate of another juror indicating that up to ten Internal Revenue Service ("IRS") agents sat in the courtroom during the trial "glaring" at the jurors, which led the jurors to discuss their fear of the IRS retaliating against the jurors if they failed to convict the defendants. *Rutherford*, 371 F.3d at 638. The district court held an

evidentiary hearing during which the trial judge "found credible the testimony of a juror that agents sitting in the first and second row behind the prosecution had glared and stared at the jurors" and "the jurors had discussed this fact among themselves on more than one occasion." *Id*. at 639. However, the district judge denied the motion for new trial because "there was no credible evidence that the IRS intended to influence the jury." *Id*. The Ninth Circuit reversed, "hold[ing] that the district court erred in concluding that the defendant must prove that the individuals involved intended to influence or prejudice the jurors in order for the presumption of prejudice to apply. The appropriate inquiry is whether the unauthorized conduct 'raises a risk of influencing the verdict,' or 'had an adverse effect on the deliberations.'" *Id*. at 644 (quoting *Caliendo*, 365 F.3d at 697; *Henley*, 238 F.3d at 1115).

Similarly, in *United States v. Elias*, 269 F.3d 1003 (9th Cir. 2001), in determining whether the presumption of prejudice should apply, the Ninth Circuit focused on the the jurors' perceptions of the conduct at issue rather than the intent of the individual alleged to have tampered with the jury. In *Elias*, after the verdict was entered, the trial judge learned that the jury foreperson told prosecutors that another juror told him that the defendant had approached the juror "during the middle of trial" and "asked what it would take to buy her off." *Id*. at 1019. The trial judge held an evidentiary hearing at which the jurors who knew of the contact testified that they believed that the defendant had made the comments in jest. *See id*. at 1019–20. The jurors informed the trial court that the alleged remarks did not scare them or distract them from listening to the evidence and that they were able to remain fair and impartial in the case. *See id*. at 1020. The Ninth Circuit affirmed the trial court's denial of defendant's motion for new trial, concluding that the district court conducted an appropriate inquiry and rejecting the defendant's contention that it was improper for the judge to inquire into the juror's perceptions of the incident pursuant to Rule 606(b). *See id*. As the Ninth Circuit stated in *Rutherford*, "the inquiry in *Elias* was centered not on whether the defendant had intended to bribe the jurors—the defendant was not called to testify about his intent in

making the comments—but on the jurors' perception of the defendant's conduct, i.e. whether they believed he was joking or serious and whether the defendant's conduct had scared or distracted them." *Rutherford*, 371 F.3d at 643 (citing *Elias*, 269 F.3d at 1020).

Here, the intent of the sender of the text is irrelevant. The Government argues that it is virtually inconceivable that the sender of the text was related to anyone involved in this case or that the sender had any knowledge of Juror Number 1's status as a juror. (*See* ECF No. 333 at 3–4.) The jurors' identities were anonymous to all but Court personnel and the prosecution and defense teams. The "Vaness" mentioned once in passing at trial had no known connection to Colorado, to the cooperator connected to Colorado, to the Defendant, to the surname "Zhang," or to a "charity gala." However, the focus here is on "the jurors' perception of the [text sender]'s conduct." *Rutherford*, 371 F.3d at 643.

Three jurors knew of the existence of the text exchange prior to the issuance of the verdict and discharge of the jury. Juror Numbers 3 and 7 testified unequivocally and credibly that they did not perceive the text exchange to be connected to the case and that they told Juror Number 1 that she did not have reason to be concerned. Focused solely on Juror Numbers 3 and 7, the text clearly was not "'sufficiently improper'" to warrant proceeding to the second part of step one of the *Godoy* test, *Clark*, 936 F.3d at 970 (quoting *Godoy*, 861 F.3d at 967), because these jurors believed unequivocally that the text was "a scam message" and any connection to the trial was "just pure coincidence." (ECF No. 374 at 21.)

Juror Number 1 testified: "I personally had concluded, like, this is not something that's important. It's most likely spam and nothing that's actually connected with what's being discussed here." (ECF No. 374 at 9–10.) She also testified that she thought "maybe this [text] is associated [with the case], but odds are it's not." *Id*. at 9. Juror Number 1 testified that she did not "fear any retaliation against [her] from any individual" regardless of whether she voted to acquit or convict Defendant. *Id*. at 10.

When asked if she felt "any intimidation or fear or concern from the message," Juror Number 1 testified: "I mean, to be quite honest, no. But just to be someone that's protective of my own safety, I didn't want to take a chance. So, ultimately, no, but I was wary." *Id*. Juror Number 1 explained that she discussed the text with her fellow jurors and the bailiff to "see if this is actually something to be concerned about just for my own peace of mind. Because I knew that if I didn't ask and then left here, it would just keep, like – I don't know if that makes sense…. Like, it would keep being in my mind, and I just wanted to put it to bed." *Id*. at 10–11. In short, although Juror Number 1 testified credibly that she believed the text was "most likely spam and nothing that's actually connected with" the case and she did not "fear any retaliation," in light of Juror Number 1's "wariness," the Court proceeds to consider the second half of step one of the *Godoy* test.

### b. Whether the Contact Gives Rise to a Credible Risk of Affecting the Outcome of the Case

"[T]he second half of the first step" of the *Godoy* test is "determining whether the sufficiently improper contact gives rise to a 'credible risk of affecting the outcome of the case.'" *Clark*, 936 F.3d at 970 (quoting *Godoy*, 861 F.3d at 967). As discussed above, the Court "considers the full context of the contact to determine whether a credible risk of prejudice exists." *Godoy*, 861 F.3d at 967. "Among the considerations relevant to this determination are the identity of the outside party and the nature of the contact." *Id*. Here, Juror Number 1 thought the text was "most likely spam," but she apparently harbored some "wariness" that the text may have been connected to one of the cooperating witnesses. It is unclear from the record which cooperating witness Juror Number 1 was considering, given that cooperating witness A.L. testified that he was associated with "Vaness," while cooperating witness J.M. was the only witness with a known connection to Colorado.

In any event, the Ninth Circuit has stated that "regardless of the outside party's identity—communications about the matter pending before the jury, if not made in

pursuance of the rules and the instructions of the court, greatly increase the risk of prejudice." *Godoy*, 861 F.3d at 967. Here, Juror Number 1 testified that the text exchange referenced a charity gala. There is no indication that the exchange ever touched upon the trial, the Defendant, any witness or evidence in the trial, or any issue that the jury was deliberating. *Cf. Von Tobel*, 975 F.3d at 858 ("[T]o determine whether the defendant has met his or her burden to show possible prejudice, courts can consider a variety of factors, including: (1) whether the communication concerned the case…."). This factor weighs against a finding of a risk of prejudice.

"[T]he length and nature of the contact," *id.*, was brief and the subject matter of the text was not threatening. Juror Number 1 quickly blocked the number and deleted the message. It appears from Juror Number 1's testimony that she did not give the text exchange any particular consideration until the next day, when she noticed the name "Vaness" in her notes and a separate reference to Colorado. As Juror Number 1 testified, it was "those two factors [that] made [Juror Number 1] think maybe this is associated, but odds are it's not." (ECF No. 374 at 9.) This factor weighs against a finding of a risk of prejudice.

The "evidence of the actual impact on the juror," *Von Tobel*, 975 F.3d at 858, is that the text exchange produced "wariness" in Juror Number 1, but otherwise she did not "feel any intimidation or fear or concern from the message"; she did not "fear any retaliation" whether she voted to convict or acquit; the text exchange did not "in any way impact [her] ability to be fair and impartial"; and the text exchange did not "negatively impact [her] ability to listen to and follow the instructions that the Court gave." (ECF No. 374 at 10, 11–12.) Defendant asserts that "the jurors were subjected to graphic testimony about a DTO's murderous, retaliatory-fueled enterprise" and one of the cooperators testified that he "was actively engaged in corrupting the criminal justice system" by paying prison guards to transport contraband, and therefore, "it would have been reasonable for Juror 1 to believe that past was prologue and [cooperator] C003 was attempting to corrupt the jury process by contacting her." (ECF

No. 372 at 6, 7.) However, there is no evidence that Juror Number 1 (or any other juror) considered the nature of the case or the cooperator's testimony about bribing prison guards when contemplating whether the text message was connected to the case. To the extent it would be reasonable to speculate that the nature of the case and the cooperator testimony contributed to Juror Number 1's "wariness" surrounding the text, the fact remains that Juror Number 1 credibly testified that she did not "fear any retaliation" whether she voted to convict or acquit, the text exchange did not "in any way impact [her] ability to be fair and impartial," and the text exchange did not "negatively impact [her] ability to listen to and follow the instructions that the Court gave." (ECF No. 374 at 10, 11–12.) On balance, this factor weighs against a finding of a risk of prejudice.

The Court considers "the possibility of eliminating prejudice through limiting instructions." *Von Tobel*, 975 F.3d at 858. Since the Court was not notified of the issue until after the verdict was received and the jury discharged, the Court had no opportunity to issue limiting instructions specific to the text exchange. However, the Court instructed the jury that "[y]ou must decide the case solely on the evidence and the law," and the Court gave Ninth Circuit model criminal instructions 6.6 and 6.7, outlining what is evidence and what is not evidence. (ECF No. 330 at 1, 5–6.) Specifically, the Court instructed the jury: "Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial." *Id*. at 6. Given Juror Number 1's credible testimony that the text exchange did not negatively impact her ability to listen to and follow the Court's instructions, the Court "presume[s] that jurors follow the instructions."[5] *Fields v. Brown*, 503 F.3d 755,

---

[5] Defendant contends that Juror Number 1 did not follow the Court's instruction that "[i]f you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court." (ECF No. 330 at 43.) As discussed below, the Court does not find juror misconduct based upon Juror Number 1's failure to follow this instruction. Juror Number 1 credibly testified that she "personally had concluded … [the text was] most likely spam and nothing that's actually connected with what's being discussed here." (ECF No. 374 at 10.) In any event, Juror Number 1 ultimately notified the Court through the bailiff on the same day that she first had the thought that "maybe this [text] is associated [with someone involved in the case], but odds are it's not." *Id*. at 9.

782 (9th Cir. 2007) (en banc) (citing *Kansas v. Marsh*, 548 U.S. 163, 179–80 (2006); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)).

Defendant primarily relies upon four cases in arguing that the factors weigh in favor of finding a presumption of prejudice: *United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993); *United States v. Dutkel*, 192 F.3d 893 (9th Cir. 1999); *United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001); and *United States v. Simtob*, 485 F.3d 1058 (9th Cir. 2007). However, as discussed below, each of these cases addressed materially different circumstances than this case.

In *Angulo*, a juror received an anonymous phone call during trial in which the caller said, "I know where you live." 4 F.3d at 846. The juror told her fellow jurors about the call and later informed the judge. The judge excused the juror who received the call but made no inquiry of the effect of the call on the other jurors. The Ninth Circuit held that the district court abused its discretion in failing "to hold an evidentiary hearing to determine whether the jurors who knew of the threat were able to act impartially and without bias." *Id*. at 848. The Ninth Circuit stated that "the Supreme Court has stressed that the remedy for allegations of jury bias is a hearing, in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not it was prejudicial." *Id*. at 846 (citing *Remmer*, 347 U.S. at 229–30). The Ninth Circuit stated that "in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." *Id*. at 847. The court stated that, "without a hearing, a district court does not have the essential facts to properly evaluate a defendant's motion for mistrial." *Id.* By contrast, here the Court has conducted an evidentiary hearing involving all jurors and, unlike the trial court in *Angulo*, this Court has "the essential facts to properly evaluate a defendant's motion for mistrial." *Id*.

*Dutkel* and *Henley* addressed significantly more aggravated facts than are presented in this case. In *Dutkel*, the facts were as follows:

34

During the … trial, [Dutkel's co-defendant] Washington employed two henchmen, Brandt Ellis and Leslie Mumphrey, to bribe and/or intimidate Felton Johnson, one of Dutkel and Washington's jurors. Early in the trial, Ellis approached Johnson outside the courthouse and told him that "the White guy [Dutkel] was guilty and that the Black guy was not guilty." Explaining that Washington was in trouble with the government regarding his taxes, Ellis told Johnson, "[w]e cannot afford the Black guy to go to jail." Ellis and Mumphrey promised Johnson cash, a job and a new car if he voted to acquit Washington. They also mentioned Johnson's three-day-old daughter, intimated that they would follow him home and made it clear that they were monitoring his every move. As a consequence of these importunings, Johnson "freely talked about the case" with them. He spoke with them frequently during the trial, made daily reports about the jury's deliberations, gave them feedback for Washington's lawyers and assured them that he thought Dutkel was guilty and Washington was not. The jury eventually convicted Dutkel, and deadlocked as to Washington, with Johnson the lone holdout.

*Dutkel*, 192 F.3d at 894. The Ninth Circuit stated:

As we read *Remmer*, a presumption of prejudice arises if a juror was subjected to coercion or bribery, and if this intrusion may have affected the juror in the exercise of his judgment. Where the intrusion is (or is suspected to be) on behalf of the defendant raising the claim of prejudice, the presumption arises automatically because jurors will no doubt resent a defendant they believe has made an improper approach to them. The matter is more complicated where, as here, the intrusion is clearly made on behalf of another defendant. Under these circumstances, the question still is whether the intervention interfered with the jury's deliberations by distracting one or more of the jurors, or by introducing some other extraneous factor into the deliberative process. Once jury tampering by a co-defendant is established, the defendant must make a prima facie showing that the intrusion had such an adverse effect on the deliberations. Unless the district court finds that this showing is entirely frivolous or wholly implausible, it must order a *Remmer* hearing to explore the degree of the intrusion and likely prejudice suffered by the defendant.

*Id*. at 897. The Ninth Circuit explained that a presumption of prejudice had been established under the facts of the case:

Ellis and Mumphrey mentioned Dutkel, if only by way of contrast, and some of their statements (e.g., "the White guy was guilty and … the Black

guy was not guilty") could have been construed as pressuring Johnson not only to acquit Washington, but also to convict Dutkel. For his part, Johnson did not merely assure Ellis and Mumphrey that he thought Washington was innocent, but also that he thought Dutkel was guilty. Was this Johnson's honest assessment, or an effort to give Ellis and Mumphrey what he thought they wanted? There is also evidence that Ellis and Mumphrey's repeated contacts with Johnson left him, like the jurors in *Remmer* and *Cheek*, a "disturbed and troubled man," deeply concerned about his own and his family's safety. During the FBI investigation into Washington's jury tampering, several of the jurors reported that Johnson was distracted and expressed fear about his family, and Johnson himself stated that he was "very scared" by the contacts. Such worries may well have prevented Johnson from thinking about the evidence or paying attention to the judge's instructions. Further, Johnson actually yielded to the improper influence. This is not without significance. The jurors in *Remmer*, *Angulo* and *Cheek*—indeed in most jury tampering cases—disclosed the illicit contact and thus did not fear being discovered. By contrast, Johnson had to worry not only about threats to his family, but also about concealing his predicament from the court and his fellow jurors. It is possible that Johnson was hesitant about engaging in the normal give and take of deliberations, for fear of giving himself away. Finally, Johnson gave Ellis and Mumphrey information about discussions in the jury room, and this information may have found its way back to Washington's lawyers. Such information may have been used to more effectively shift blame from Washington to Dutkel.

*Id*. at 898 (quoting *Remmer v. United States*, 350 U.S. 377, 381 (1956) ("*Remmer II*"); *United States v. Cheek*, 94 F.3d 136, 143 (4th Cir. 1996)); *see also Remmer II*, 350 U.S. at 381 (stating that "[f]rom [the affected juror]'s testimony it is quite evident that he was a disturbed and troubled man from the date of the [bribery attempt] until after the trial"); *Cheek*, 94 F.3d at 140 & 142 (stating that a juror "was devastated and afraid as a result of" a bribery attempt, and the juror testified "he was 'very afraid' of retaliation by the defendants"). The Ninth Circuit remanded for the trial court to conduct an evidentiary hearing wherein "[t]he inquiry should focus on whether Ellis and Mumphrey's overtures affected Johnson's behavior—and the behavior of the other jurors—during deliberations," and "should also focus on whether information fed back by Johnson influenced Washington's defense to the detriment of Dutkel." *Id*. at 899.

The Ninth Circuit stated that, "[i]n order to grant relief, the court need not conclude that the verdict as to Dutkel would have been different but for the jury tampering, but rather that the course of deliberations was materially affected by the intrusion." *Id*.

In *Henley*, during the course of trial, defendant Darryl Henley, through an intermediary, offered to pay a juror named Quilhuis a $50,000 bribe in exchange for voting not guilty. *See* 238 F.3d at 1113. The juror Quilhuis insisted on speaking to Henley directly, and after Henley agreed to pay half the money upfront, Quilhuis agreed. "Quihuis had second thoughts soon thereafter" and informed defendant's intermediary that he would not participate in the scheme. *Id*. After "numerous efforts were made to persuade Quihuis to reconsider" rejecting the bribe, Quihuis "attempt[ed] to get himself excused from the jury" two days into deliberations by claiming to the trial judge that he had read a newspaper article about the case that "had made a 'big impact' on him and that he had had difficulty sleeping." *Id*. After the trial judge refused to disqualify Quilhuis, Henley renewed his offer to bribe Quilhuis, and "Quihuis once again declined the offer. The jury returned guilty verdicts against all defendants the next day." *Id*. Henley's co-defendants moved for a new trial based upon Henley's bribery attempt and numerous post-trial statements by Quilhuis that "he feared that he or his family would be in jeopardy" if he reported the bribery attempt to the trial judge. *Id*. at 1116; *see also id*. ("I was extremely scared that if I went to the judge something would happen to me or my family," and the bribery attempt "screwed with me as far as I felt threatened that if I didn't cooperate, something would happen to me or my family because [Henley's intermediary] knew where I lived and … reflecting back to [Henley's co-conspirator threatening a witness by saying] do you ever wanna see your son walk again crossed my mind. That if I don't cooperate, something's gonna happen to me and my family."). The Ninth Circuit reversed the denial of the motion for new trial, holding that "the [trial] court erred in basing its decision on the 'overwhelming evidence' of appellants' guilt rather than considering the effect of the bribery attempt on the course of deliberations." *Id*. at 1116. The Ninth Circuit stated that "*Dutkel* expressly

37

distinguishes the 'prosaic kinds of jury misconduct' cases cited by the district court from the 'much more serious intrusion' of a bribe or threat." *Id*. (quoting *Dutkel*, 192 F.3d at 895). The Ninth Circuit held that the evidence was sufficient to create a presumption of prejudice, relying upon *Dutkel*:

> As in *Dutkel*, there is evidence that Quihuis's contacts with [the intermediary] and Darryl Henley left him "a 'disturbed and troubled man,' deeply concerned about his own and his family's safety." As in *Dutkel*, Quihuis "stated that he was 'very scared' by the contacts." Quihuis's fears "may well have prevented [him] from thinking about the evidence or paying attention to the judge's instructions." Finally, because Quihuis did not report the incident to the court, he "had to worry not only about threats to his family, but also about concealing his predicament from the court and his fellow jurors. It is possible that [Quihuis] was hesitant about engaging in the normal give and take of deliberations, for fear of giving himself away."

*Id*. at 1117 (quoting *Dutkel*, 192 F.3d at 898; *Remmer*, 350 U.S. at 381). The Ninth Circuit stated that, "[b]ecause Quihuis has now pleaded guilty to charges relating to his conduct in this case, it is likely that he will no longer be able to invoke his Fifth Amendment right against self-incrimination and that he may be compelled to testify." *Id*. The appellate court remanded with instructions for the trial court to conduct an evidentiary hearing to be held wherein "[t]he government has the burden of establishing not that the appellants would have been convicted with or without the bribery attempt, but rather, as *Dutkel* instructs, that there is no 'reasonable possibility' that Quihuis was 'affected in his freedom of action as a juror.'" *Id*. (quoting *Dutkel*, 192 F.3d at 895).

Here, Defendant seizes upon *Dutkel*'s and *Henley*'s statements in the above-quoted passages about the bribed juror being "distracted" and "introducing some other extraneous factor into the deliberative process." (*See* ECF No. 372 at 6, 8, 9.) Defendant argues that Juror Number 1 likewise was distracted by the text exchange and distracted other jurors by the exchange as well. Defendant contends that Juror Number 1's "distractedness manifested itself when she commandeered the jury's focus, away from a discussion of the law and evidence, to a disquisition about the origin and meaning of

the extraneous communique." *Id*. at 6. This contention is contrary to the credible evidence demonstrating that the text exchange was only discussed once prior to the verdict, when Juror Number 1 asked two other jurors about it during a break. As discussed above, there is no credible evidence that the text exchange ever was discussed while the jury was all together and actively deliberating, much less that it "commandeered the jury's focus, away from a discussion of the law and evidence." *Id*. There is no evidence that any of the three jurors who knew about the text prior to the verdict were distracted at all during active deliberations. All three jurors credibly testified that they did not think that text was connected to the case. And to the extent Juror Number 1 equivocated on this point "[i]n … the tiniest bit of [her] mind that just goes to very negative places," (ECF No. 374 at 8), she credibly testified that she "personally had concluded … this is not something that's important" because "[i]t's most likely spam and nothing that's actually connected with what's being discussed here." *Id*. at 9–10. In any event, she also credibly and unequivocally testified that the text exchange did not cause her to fear retaliation, did not impact her ability to follow the Court's instructions, and did not impact her ability to be fair and impartial.

Moreover, the facts of *Dutkel* and *Henley* are drastically different than the facts here. Unlike *Dutkel* and *Henley*, Juror Number 1 did not know she was the subject of jury tampering—indeed, she thought it more likely that the text about a "charity gala" had nothing to do with the case. Unlike *Dutkel* and *Henley*, Juror Number 1 could not reasonably be described as "a 'disturbed and troubled [wo]man,' deeply concerned about h[er] own and h[er] family's safety." *Henley*, 238 F.3d at 1117 (quoting *Dutkel*, 192 F.3d at 898; *Remmer*, 350 U.S. at 381). Unlike *Dutkel* and *Henley*, there is no evidence Juror Number 1's wariness about the text exchange "prevented [her] from thinking about the evidence or paying attention to the judge's instructions," *id*.; instead, Juror Number 1's credible testimony shows the opposite to be true. Unlike *Dutkel* and *Henley*, Juror Number 1 did not commit criminal acts related to the subject matter of this case, so there is no evidence that Juror Number 1 was "worr[ied] not only about

threats to h[er] family, but also about concealing h[er] predicament from the court and his fellow jurors," or that Juror Number 1 "was hesitant about engaging in the normal give and take of deliberations, for fear of giving h[er]self away." *Id*. In short, the "distractions" affecting the jurors in *Dutkel* and *Henley* were vastly different than the text exchange here. Finally, unlike *Dutkel* and *Henley*, this Court has conducted a full evidentiary hearing, mindful of the Ninth Circuit's most recent application of the *Remmer/Maddox* line of cases.

In the fourth case relied upon by Defendant, *Simtob*, the trial court informed the parties during trial that "a juror had reported that Simtob had been 'eye-balling' the juror and that the juror felt threatened by that conduct." 485 F.3d at 1060. The trial court conducted no inquiry of the juror who reported feeling threatened or of any other juror. The Ninth Circuit vacated the conviction and remanded for an evidentiary hearing and stated:

> Without any inquiry whatsoever into the juror's state of mind or communications with other jurors, the district court had no way of knowing whether any juror harbored lingering bias from the eye-balling incident. …
>
> Because the district court made no inquiry of the juror when the juror voiced his or her concern that the defendant's alleged act of eye-balling the juror made the juror feel threatened, it abused its discretion in failing to take proper remedial action on the facts of this case. We, therefore, vacate Simtob's conviction and remand for the district court to recall the complaining juror and to undertake whatever inquiry it deems appropriate—whether through an in camera hearing or otherwise—to determine whether the perceived threat impaired that or any other juror's ability to act fairly and impartially. Upon remand, the district court must make findings about possible bias that the affected juror or any other juror may have harbored as a result of the alleged eyeballing incident. If the district court finds no such impairment, it can, of course, reinstate the conviction.

*Id*. at 1065–66.

Here, in contrast to *Simtob*, this Court has conducted inquiry under oath of each juror to determine whether the text Juror Number 1 received "impaired that or any other juror's ability to act fairly and impartially." *Id*. at 1066. Procedurally, this case is aligned with Simtob's subsequent appeal after remand and reinstatement of Simtob's conviction. *See United States v. Simtob*, 330 F. App'x 663 (9th Cir. 2009). In the second appeal, the Ninth Circuit affirmed, stating: "The district court's post-verdict juror queries sufficiently established that Simtob did not suffer prejudice from jury bias or, in the event such prejudice existed, any improprieties were harmless." *Id.* at 664 (citing *Simtob*, 485 F.3d at 1064; *Rutherford*, 371 F.3d at 641); *see also Elias*, 269 F.3d at 1021 (affirming the denial of defendant's motion for new trial on the basis that "Elias had not borne his burden of showing juror bias," based upon testimony that two jurors "misinterpreted [another juror]'s comments to mean that Elias had asked [the juror] what it would take to 'win' or 'turn' her vote," and the trial court's finding "that no juror believed Elias had tampered with the jury and that Elias had not shown any jurors were biased against him").

In summary, after considering the full context of the text exchange, its impact on the jurors, and the relevant factors, the Court finds that Defendant has failed "to show that the contact was 'sufficiently improper as to raise a credible risk of affecting the outcome of the case,' or of 'influencing the verdict.'" *Von Tobel*, 975 F.3d at 858 (quoting *Godoy*, 861 F.3d at 967, 970). While there is a "low threshold" to satisfying *Godoy*'s first step, *Godoy*, 861 F.3d at 967, and a showing of actual prejudice is not required, *see Von Tobel*, 975 F.3d at 858, the standard at step one nonetheless requires "more than a theoretical possibility of prejudice." *Id*. At most, only a theoretical possibility of prejudice has been shown here. Because there is no showing that "a credible risk of prejudice exists," *Godoy*, 861 F.3d at 967, the presumption of prejudice does not apply.

///

///

41

### 2. Step Two

Even if Defendant had demonstrated that the text exchange should be "'deemed presumptively prejudicial,'" *Godoy*, 861 F.3d at 962 (quoting *Remmer*, 347 U.S. at 229), the Court would then proceed to consider step two of the *Godoy* test. "Once a defendant shows a possibly prejudicial contact, the presumption of prejudice attaches, and the burden shifts to the [government] to prove the contact was harmless. Harmlessness in this context means 'that there is no reasonable possibility that the communication influenced the verdict.'" *Id.* at 968 (quoting *Caliendo*, 365 F.3d at 697). "[T]he [government] must rebut the presumption by pointing to some evidence contrary to the evidence that established it." *Id.* "Most obviously, … the prosecution could seek evidence from the jurors themselves … or from the outside party who had contact with the jury." *Id.* (citing, *inter alia*, *Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Respondent correctly notes that determinations made in *Remmer*-type hearings will frequently turn upon testimony of the juror in question, but errs in contending that such evidence is inherently suspect. As we said in *Dennis v. United States*, 339 U.S. 162, 171 (1950), '[o]ne may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.'")). "In addition, once the presumption attaches, the trial court must hold a hearing on prejudice if there is any remaining uncertainty about what actually transpired, or whether the incidents that may have occurred were harmful or harmless." *Id*. at 969 (quotation omitted).

The Court finds instructive the post-remand appeal in *Rutherford*, which is the case discussed above wherein the defendants submitted post-trial affidavits indicating that at least four jurors commented amongst themselves that up to ten IRS agents sat in the courtroom during the trial "glaring" at them, leading the jurors to discuss amongst themselves their fear of the IRS retaliating against them if they failed to convict the defendants. *Rutherford*, 371 F.3d at 638. On remand, the trial court conducted the

required evidentiary hearing involving testimony from all eleven living jurors, an employer of one of the jurors, and a defense investigator. At the conclusion of the hearing, the trial court found that the "likely consequence of the staring appears to be that the jurors ... would discuss and consider the IRS, the number of agents present, [and] possible IRS retaliation or audits." *United States v. Rutherford*, 164 F. App'x 589, 590 (9th Cir. 2006). The trial court "therefore ruled that the presumption of prejudice applied." *Id*. The trial court then ruled that the government had met its burden of proving beyond a reasonable doubt that the agents' conduct was harmless. "The district court noted that all eleven jurors testified 'unconditionally, unhesitatingly, and resolutely, and in our view credibly, that the conduct of the IRS agents ... did not affect the jurors' ability to fairly and impartially receive the evidence, listen to the evidence presented, think about the evidence, pay attention to the judge's instruction, or [their] ability to deliberate.'" *Id*. The Ninth Circuit affirmed, finding that "the district court properly applied the harmless-error review set forth by the Supreme Court in *Remmer* and later explained by the Ninth Circuit in *Henley*." *Id*. at 591.

Here, the Court has conducted an evidentiary hearing and no party contends that there are any additional questions, witnesses, or evidence necessary to learn "what actually transpired, or whether the incidents that may have occurred were harmful or harmless." *Godoy*, 861 F.3d at 969. The Court has found that all three jurors who knew of the text exchange prior to the verdict—i.e., Juror Numbers 1, 3, and 7—credibly testified that the text did not cause them to fear any retaliation, did not impact their ability to be fair and impartial, and did not impact their ability to follow the Court's instructions. The Court has found that the text exchange was never discussed during active deliberations, and instead, prior to the jury's discharge, the text exchange was only discussed once during a break in a private conversation between Juror Numbers 1, 3, and 7. The Court finds that, when considering the totality of the evidence,[6] the

---

[6] As discussed above, the Court has found that step one of the *Godoy* test has not been satisfied and therefore a presumption of prejudice has not arisen. In the alternative, the only manner in which a reasonable jurist could find that step one of the *Godoy* test was satisfied would be by focusing on Juror Number 1's expression of "wariness" and her

Government has established beyond a reasonable doubt that the text exchange was harmless—that is, "that there is no reasonable possibility that the communication influenced the verdict." *Id.* at 968 (quoting *Caliendo*, 365 F.3d at 697). In the terms stated by *Henley* and *Dutkel*, the evidence shows "that there is no 'reasonable possibility' that [Juror Number 1 or any other juror] was 'affected in h[er] freedom of action as a juror." *Henley*, 238 F.3d at 1118 (quoting *Dutkel*, 192 F.3d at 899). Accordingly, even if Defendant had demonstrated that the text exchange should be deemed presumptively prejudicial, the Court finds beyond a reasonable doubt that the text exchange was harmless.

To the extent the Motion for New Trial is based upon "allegations of improper contact between a juror and an outside party," *Godoy*, 861 F.3d at 959, the motion is denied.

### B. Juror Misconduct

Defendant also bases the Motion for New Trial on Juror Number 1's "misconduct" in "suppress[ing] [the text] from the court," "conduct[ing] independent research into the source of the communique," and "taint[ing] the jury by discussing the matter with them." (ECF No. 372 at 10.) While it is unclear whether this constitutes a separate basis from the *Remmer*/*Godoy* basis discussed above, the Court briefly addresses it.

As discussed above, "[i]f a court determines that a juror has improperly brought extraneous information to the jury's attention, the inquiry must then focus on whether 'there is a reasonable possibility that the extraneous information could have affected the verdict.'" *Montes*, 628 F.3d at 1187 (quoting *Keating*, 147 F.3d at 900). "[T]he remedy for such allegations is a hearing at which 'the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not it was prejudicial.'" *Id.*

---

raising the issue with other jurors and the bailiff. The Court's finding that the Government has met its burden at step two of the *Godoy* test is based upon the totality of the jurors' testimony, including testimony "contrary to the evidence that [would have] established" the step-one presumption of prejudice. *Godoy*, 861 F.3d at 968.

(quoting *Dutkel*, 192 F.3d at 899 (internal quotation marks omitted)). Here, the Court has conducted such a hearing.

"There is no bright line test for determining whether a defendant has suffered prejudice from an instance of juror misconduct." *Id*. (quoting *Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000)). The Ninth Circuit "place[s] great weight on the nature of the extraneous information that has been introduced into deliberations." *Sassounian*, 230 F.3d at 1109 (quotation omitted). The following factors are relevant to the inquiry:

> (1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Id*. (quoting *Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir. 1988)). The Ninth Circuit has "also pointed to other factors that might nonetheless suggest that the potential prejudice of the extrinsic information was diminished in a particular case." *Id*. (quotation omitted). These include:

> (1) whether the prejudicial statement was ambiguously phrased; (2) whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; (3) whether a curative instruction was given or some other step taken to ameliorate the prejudice; (4) the trial context; and (5) whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*Id*. (quoting *Jeffries v. Wood*, 114 F.3d 1484, 1491 (9th Cir. 1997) (en banc), *overruled in unrelated part by Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012)). "While these factors guide our analysis, 'no one of these factors is dispositive,' and the 'ultimate question is whether it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict.'" *Montes*, 628 F.3d at 1188 (quoting *Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir. 1988); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986)).

Defendant contends that Juror Number 1 committed misconduct by failing to follow the Court's instruction that "[i]f you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court." (ECF No. 330 at 43.) However, Juror Number 1 credibly testified that she "personally had concluded … [the text was] most likely spam and nothing that's actually connected with what's being discussed here." (ECF No. 374 at 9–10.) It appears that at least a portion of Juror Number 1's motivation for raising the issue with her fellow jurors was to get their opinion about whether the text was sufficiently concerning to justify raising with the Court. Juror Number 1 ultimately notified the Court the day after she received the text and on the same day that she first had the thought that "maybe this [text] is associated [with someone involved in the case], but odds are it's not." *Id*. at 9. Given this credible testimony, the Court does not find that Juror Number 1 committed misconduct by failing to report the text to the Court prior to the verdict.

Defendant also contends that Juror Number 1 committed misconduct by "conduct[ing] independent research into the source of the communique." (ECF No. 372 at 10.) Defendant apparently is referring to Juror Number 1's testimony that, on the evening she received the text, she "Googled the phone number to see if it would link to someone's social media that I knew." (ECF No. 374 at 8.) There is no evidence that, at the time Juror Number 1 "Googled the phone number," she had contemplated that the text might be connected to the case. Instead, Juror Number 1 testified that the possibility of a connection to the case was raised in her mind when "looking back at [her] notes," *id*. at 9, which were kept in the jury room and would have first been available to her on the day she raised the issue with the Court.

The Court has already addressed many of the factors discussed in *Sassounian* above in relation to the *Godoy* test, and the Court incorporates its discussion above here. Only three jurors knew of the text exchange prior to the verdict, and they only discussed the text once pre-verdict, during a break in the deliberations. Each of these three jurors

credibly testified that they did not think it was connected to the case. Juror Number 1 is the only juror with any doubt on that issue, and she "personally had concluded … this is not something that's important" and "[i]t's most likely spam and nothing that's actually connected with what's being discussed here." *Id*. at 9–10. Even if any juror thought, in "the tiniest bit of [their] mind," *id*. at 8, that there was a connection, the text about a charity gala "was ambiguously phrased" as it might relate to this case. *Sassounian*, 230 F.3d at 1109. As discussed above, there is no evidence that the text exchange had any effect on the deliberations or the jurors' ability to be fair and impartial in considering the evidence or following the Court's instructions.

Even if Juror Number 1's actions could properly be characterized as misconduct, the Court finds there is no reasonable possibility that Juror Number 1 or any other juror was affected in her freedom of action as a juror. Similarly, the Court finds there is no "reasonable possibility that the extraneous information [i.e., the text exchange] could have affected the verdict." *Montes*, 628 F.3d at 1187. To the extent the Motion for New Trial is based upon Juror Number 1's purported misconduct and/or her improperly bringing extraneous information to the jury's attention, the motion is denied.

## VI.    Conclusion

IT IS HEREBY ORDERED that the Motion for New Trial is denied. (ECF No. 372.)

Dated:  September 12, 2025

Hon. William Q. Hayes
United States District Court